Nebraska Supreme Court Online Library
www.nebraska.gov/courts/epub/
02/26/2016 08:20 AM CST

State of Nebraska, appellee, v.
Eric M. Henry, appellant.
___ N.W.2d ___

Filed February 26, 2016.    No. S-14-519.

1. **Jury Instructions: Appeal and Error.** Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court.

2. **Motions to Suppress: Appeal and Error.** In determining the correctness of a trial court's ruling on a motion to suppress, the appellate court will uphold the trial court's findings of fact unless they are clearly wrong, but will reach a conclusion independent of that reached by the trial court with regard to questions of law.

3. **Pretrial Procedure: Appeal and Error.** Unless granted as a matter of right under the Constitution or other law, discovery is within the discretion of a trial court, whose ruling will be upheld on appeal unless the trial court has abused its discretion.

4. ____: ____. The decision of the trial court granting or denying a motion for a bill of particulars requested by the accused will not be reversed by the appellate court in the absence of an abuse of discretion on the part of the trial court in making its adjudication.

5. **Pleadings: Parties: Judgments: Appeal and Error.** A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown, and an appellate court will find such an abuse only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice.

6. **Rules of Evidence.** In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.

7. **Rules of Evidence: Appeal and Error.** Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the

trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.

 8. **Trial: Juries: Evidence.** A trial court does not have discretion to submit testimony materials to the jury for unsupervised review, but the trial court has broad discretion to submit to the jury nontestimonial exhibits, in particular, those constituting substantive evidence of the defendant's guilt.

 9. **Witnesses.** The manner in which a witness may be examined is within the sound discretion of the court.

10. **Jury Instructions: Proof: Appeal and Error.** The appellant has the burden to show that a questioned jury instruction prejudiced him or otherwise adversely affected his substantial rights.

11. **Jury Instructions: Appeal and Error.** All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.

12. **Statutes: Appeal and Error.** An appellate court will not read into a statute a meaning that is not there.

13. **Pretrial Procedure: Evidence.** In the absence of any discovery motion under Neb. Rev. Stat. § 29-1913 (Reissue 2008), there is no discovery order, and without a discovery order, there can be no violation requiring suppression of the evidence.

14. **____: ____.** Where the State in good faith destroys evidence before a defense discovery motion under Neb. Rev. Stat. § 29-1913(1) (Reissue 2008) can be made, a district court is not obliged to suppress the State's tests or analyses under § 29-1913(2) without any motion for discovery under § 29-1913(1).

15. **Motions to Suppress.** A suppression motion cannot serve as a substitute for a discovery motion.

16. **Indictments and Informations.** Where an information alleges the commission of a crime using language of the statute defining that crime or terms equivalent to such statutory definition, the charge is sufficient.

17. **Criminal Law: Robbery.** It is not necessary to a charge of robbery to name the alleged victim.

18. **Rules of Evidence.** Generally, the foundation for the admissibility of text messages has two components: (1) whether the text messages were accurately transcribed and (2) who actually sent the text messages.

19. **Rules of Evidence: Proof.** The proponent of text messages is not required to conclusively prove who authored the messages; the possibility of an alteration or misuse by another generally goes to weight, not admissibility.

20. **Trial: Hearsay: Testimony: Evidence.** It is generally sufficient to make a general hearsay objection to a specific statement, but a general hearsay objection to the entirety of a witness' testimony or to multiple statements in an exhibit, each admissible or objectionable under differing theories, is not usually sufficient to preserve the hearsay objection.

21. **Trial: Evidence: Appeal and Error.** Unless an objection to offered evidence is sufficiently specific to enlighten the trial court and enable it to pass upon the sufficiency of such objections and to observe the alleged harmful bearing of the evidence from the standpoint of the objector, no question can be presented therefrom on appeal.

22. **Trial: Evidence: Presumptions.** Once the proponent of evidence shows that the proposed evidence is relevant and competent, it is presumptively admissible.

23. **Trial: Hearsay: Evidence: Proof.** It is the party objecting to the evidence as hearsay who bears the burden of production and persuasion that the objected-to evidence is in fact hearsay.

24. ____: ____: ____: ____. Once the opponent demonstrates the evidence is hearsay, the burden shifts to the proponent to lay the foundation for one of the exceptions to the hearsay rule.

25. **Trial: Evidence.** Regardless of whether the proponent or the trial court articulated no theory or the wrong theory of admissibility, an appellate court may affirm the ultimate correctness of the trial court's admission of the evidence under any theory supported by the record, so long as both parties had a fair opportunity to develop the record and the circumstances otherwise would make it fair to do so.

26. **Conspiracy: Hearsay: Rules of Evidence.** The rule that a statement by a coconspirator is not hearsay if made during the course and in furtherance of a conspiracy is construed broadly in favor of admissibility.

27. **Conspiracy.** A conspiracy is ongoing until the central purposes of the conspiracy have either failed or been achieved.

28. ____. There is no talismanic formula for ascertaining when a coconspirator's statements are in furtherance of the conspiracy; a statement need not be necessary or even important to the conspiracy, as long as it can be said to advance the goals of the conspiracy as opposed to thwarting its purpose.

29. ____. The definitional exclusion to the hearsay rule applies to the coverup or concealment of the conspiracy that occurs while the conspiracy is ongoing, just as it would to any other part of the conspiracy.

30. ____. When a conspiracy involves a sequence of objectives, concealment is usually an integral part thereof.

31. **Conspiracy: Proof: Presumptions.** Upon proof of participation in a conspiracy, a conspirator's continuing participation is presumed

unless the conspirator demonstrates affirmative withdrawal from the conspiracy.

32. **Conspiracy.** To withdraw from a conspiracy such that statements of a coconspirator are inadmissible, the coconspirator must do more than ceasing, however definitively, to participate; rather, the coconspirator must make an affirmative action either by making a clean breast to the authorities or by communicating abandonment in a manner calculated to reach coconspirators, and must not resume participation in the conspiracy.

33. **Trial: Juries: Verdicts: Appeal and Error.** Harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant.

34. **Trial: Evidence: Words and Phrases.** The "rule of completeness" states that an opponent may require one introducing part of a writing or statement to introduce any part which ought in fairness to be considered with the part introduced.

35. **Appeal and Error.** An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.

Appeal from the District Court for Platte County: Robert R. Steinke, Judge. Affirmed.

Mark M. Sipple and Erik C. Klutman, of Sipple, Hansen, Emerson, Schumacher & Klutman, for appellant.

Douglas J. Peterson, Attorney General, and James D. Smith for appellee.

Heavican, C.J., Wright, Connolly, McCormack, Miller-Lerman, and Cassel, JJ., and Moore, Chief Judge.

Wright, J.

## I. NATURE OF CASE

Eric M. Henry was convicted of felony murder, use of a deadly weapon to commit a felony, and conspiracy to commit robbery for his involvement in the stabbing death of Steven T. Jorgensen. He was sentenced to consecutive terms of life imprisonment, 40 to 50 years' imprisonment, and 10 to 20 years' imprisonment, respectively.

On appeal, Henry assigns error to the overruling of various pretrial motions, including a motion in limine, a motion for a bill of particulars, and a motion to sever. He also challenges the admission and handling of certain evidence and the giving of an instruction. We affirm.

## II. BACKGROUND

### 1. Criminal Charges

On December 20, 2013, Henry was charged by amended information with four counts. Count I alleged that he committed the first degree murder of Jorgensen "in the perpetration of or attempt to perpetrate a robbery." Count II charged use of a deadly weapon to commit a felony. Count III charged possession of a deadly weapon (brass or iron knuckles) by a prohibited person. Count IV charged criminal conspiracy to commit robbery. Specifically, count IV alleged that

> on or about May 17 or May 18, 2013, in Platte County, Nebraska, . . . Henry, with the intent to promote or facilitate the commission of felony robbery, did agree with one or more persons to engage in the result specified by the definition of the offense of robbery, and he or another person with whom he conspired committed an overt act in pursuance of the conspiracy, including at least one of the following overt acts:
>
> 1) Transported or aided the transporting of Quentin Critser from Lincoln to Platte County;
>
> 2) Attempted to obtain a gun;
>
> 3) Gave iron or brass knuckles to Quentin Critser; or
>
> 4) Went to the residence of a potential robbery victim or victims[.]

Henry moved for a bill of particulars stating "with precision and specificity the name of the 'potential robbery victim or victims' as set forth in Count IV of its Amended Information." The district court overruled the motion, after which Henry moved to sever count IV from the other counts. The motion to sever was also overruled.

## 2. Motion in Limine

Prior to trial, Henry filed a motion in limine challenging the admissibility of any evidence of the autopsy performed on Jorgensen's body, including any testimony of Dr. Robert Bowen, the pathologist. Bowen had performed an autopsy on Jorgensen's body on May 23, 2013. On May 24, the county attorney for Platte County, Nebraska, had authorized, at the request of Jorgensen's family, the release of Jorgensen's body for cremation.

Henry alleged that it would be a violation of due process and Neb. Rev. Stat. § 29-1913 (Reissue 2008) to permit the State to adduce evidence derived from examining and testing the body, because it had been destroyed before Henry had the opportunity to have it independently examined or tested. He claimed that in releasing the body for cremation, the Platte County Attorney had acted intentionally but not in bad faith.

Aside from photographs and the autopsy results, several tissue samples were apparently retained. Fingerprints were also taken, Jorgensen's clothing and a gag were collected, swabs and clippings from his fingernails were taken, and hairs were collected. However, a full accounting of what body parts or samples may have been retained was not given.

Henry did not file a motion under § 29-1913(1) asking the court to make available to the defense the evidence necessary to make tests or analyses of "ballistics, firearms identification, fingerprints, blood, semen, or other stains" like those conducted by the prosecution. Henry did not advise the prosecution that he wished the body preserved for an independent autopsy, because the body was cremated prior to bringing charges against Henry. The district court overruled Henry's pretrial motion in limine.

## 3. Jury Trial

The jury trial of Henry took place over 7 trial days. The parties stipulated that Henry had been convicted of a felony in 2007. They also stipulated that Jorgensen's DNA was the only DNA identified on any of the items seized from the crime

scene, including the knife in Jorgensen's throat and the gag in his mouth. These items were tested for fingerprints, but they yielded no identifiable prints.

### (a) Discovery of Jorgensen

Officer Dale Ciboron testified that he and two other officers with the police department in Columbus, Nebraska, discovered Jorgensen's body after being dispatched to Jorgensen's house for a welfare check on May 22, 2013. Jorgensen had not reported to work for several days. Jorgensen's supervisor testified that he last saw Jorgensen at work on May 17 and that the date was a payday. Jorgensen did not show up at work as expected on either Saturday or Monday.

Upon entering Jorgensen's house, Ciboron found Jorgensen's body on the floor between the kitchen and the living room area. The house was in disarray. There was a knife protruding from Jorgensen's neck, and a gag in his mouth. Ciboron described dried blood on Jorgensen's head.

Three officers with the Columbus Police Department arrived at the scene to investigate shortly after Ciboron. They testified that Jorgensen's body had started to decompose. One officer testified that based on her observations of decay and lividity, Jorgensen had been dead "for several days." Bloodstains were found throughout the house, including the couch, the floor, a door, baseboards, and the kitchen water faucet. Another officer explained that the blood had soaked through the carpet and padding to the wood floor underneath.

A video and photographs of the scene and Jorgensen's body were entered into evidence without objection. Jorgensen's head and chest appeared covered in blood, and the photographs show numerous apparent stab wounds to the chest, arms, hands, and neck.

### (b) Bowen

Prior to Bowen's testimony, Henry renewed his motion in limine, objecting to "the entirety of the testimony." Exhibits to be offered into evidence during Bowen's testimony were

not explicitly referenced in Henry's renewed objection. Henry again stated that he made no claim that the State acted in bad faith in releasing Jorgensen's body for cremation.

The prosecution noted that the autopsy report, photographs, and "[t]issue slides" had been made available to Henry for independent examination by an independent pathologist appointed for Henry. Henry explained that he did not have an expert who would testify differently as to Jorgensen's cause of death, and Henry did not appear to contest the time of death. Nevertheless, Henry stated that there were "issues." Henry never elaborated on what those issues were.

The district court overruled the renewed motion and allowed Bowen to testify. In denying the motion, the court noted that the body was cremated pursuant to a request by Jorgensen's family and that the detailed autopsy results, photographs, and tissue samples were available for examination by Henry's own pathologist. The court also noted that Henry did not contest, based on either Bowen's examination or his pathologist's review, Jorgensen's cause of death.

Bowen testified that the autopsy revealed 14 stab wounds on Jorgensen's neck, chest, and abdomen, and numerous "blunt force injuries" from being struck. There were lacerations on the back of Jorgensen's head consistent with being hit with brass knuckles. Bowen determined Jorgensen had died through a combination of blood loss and collapsed lungs, after receiving stab wounds to the chest, and that his death was a homicide. Bowen testified that Jorgensen had died somewhere between 24 hours and 4 days before the autopsy, which was performed on May 23, 2013.

Due to the decomposition, Bowen was unable to remove blood from the body, but he was able to test the decomposition fluid found in the chest. Bowen testified that decomposition fluid is more difficult to interpret than blood. On cross-examination, Bowen admitted that tests of samples or specimens of Jorgensen's organs, such as his brain, kidney, or liver, would have probably been more accurate.

The tests of the decomposition fluid indicated there was a significant amount of methamphetamine in Jorgensen's body at the time of death. Nevertheless, it was Bowen's opinion that the cause of death was not methamphetamine. Bowen explained that there was extensive hemorrhaging in the body that could not have occurred if Jorgensen had first died of methamphetamine.

During Bowen's testimony, a wound chart showing 14 stab wounds on Jorgensen's neck, chest, and abdomen was entered into evidence after Henry's counsel expressly stated he had no objection. In addition, 14 autopsy photographs prepared by Bowen were entered into evidence, again after Henry's counsel stated there was no objection. The autopsy report was not proffered.

### (c) Benson

Vanessa Benson testified that on May 28, 2013, she informed the police department in Lincoln, Nebraska, that she suspected her boyfriend, Quentin Critser, had been involved in Jorgensen's death. Critser was staying with Benson and was a friend of Henry's. She reported that from May 16 to 18, Critser had been in Columbus with Henry and a woman by the name of Kimberly Henderson. On May 16, Henry and Henderson came to her apartment in Lincoln to pick up Critser. Based largely on text messages that Critser sent from Benson's cell phone to Henry, Benson knew that Henry and Critser planned to commit a robbery in Columbus. Benson was upset about this, and she and Critser fought.

Critser returned on May 18, 2013, after stopping first in Grand Island, Nebraska. Benson testified that after Critser returned from Columbus, he had Jorgensen's debit card and keys. Benson saw Critser dispose of the keys in a drainage ditch. Benson testified that she led the police to where Critser had hidden Jorgensen's debit card outside of her apartment building. Benson testified without objection that Henry had texted her several times asking her why she did not like him. She never responded.

(d) Critser

Critser was a witness against Henry as part of his plea agreement. Critser testified that he met Henry while they were both incarcerated for previous convictions and that they developed a friendship after their release. In May 2013, Critser and Henry lived in Lincoln and Columbus, respectively. They kept in touch mainly via text messages.

Critser did not have his own cell phone and used Benson's cell phone to send messages to Henry. Critser testified that Henry had his own cell phone and that the number associated with Henry's cell phone was programmed into Benson's cell phone under the name "E."

Critser testified that in May 2013, Benson's cell phone received a series of text messages from Henry asking Critser to come to Columbus for the purpose of "[c]ommit[ting] a crime of some sort" to obtain between $3,000 to $10,000.

Critser stated that he had no doubt the messages were from Henry. They showed up on Benson's cell phone as being sent from "E," and Critser could also tell the texts were from Henry by the context and because he knew how Henry talked. Critser also explained that he did not communicate with anyone else who lived in Columbus.

Pursuant to the plan developed by Critser and Henry, on May 16, 2013, Henry and Henderson picked up Critser in Lincoln and took him back to Columbus. Critser described without objection that he and Benson argued before he left. Benson did not want Critser to participate in the robbery and said that he was not welcome to come back if he did.

Critser testified that during the drive to Columbus, he and Henry discussed their plans to rob a drug dealer named "Tony." Critser also testified that he and Henry "were off and on talking about [the robbery of Tony] the whole time" they were in Columbus. While Critser was in Columbus with Henry, he used Henry's cell phone to stay in touch with Benson.

Critser said that he, Henry, and Henderson spent much of the evening of May 16, 2013, looking for a gun for Henry to use

in the robbery of Tony. Sometime on May 17, Henry found a gun for sale by a man called "Cowboy," but he needed money to buy it. Critser testified that he tried to convince Henry that they could rob Tony without a gun, but Henry was "adamant about having a gun to do it."

Because Jorgensen owed Henry money and because Henderson knew that Jorgensen would get paid that day, a plan developed "to go over there and collect some money" in order to buy the gun they would use to rob Tony. Critser had been aware that Henry had "fronted some people in Columbus some meth and they owed him money and he wanted me to come beat them up," but he did not know if one of those people was Jorgensen.

Critser testified that around 6 p.m. on May 17, 2013, he, Henry, and Henderson went to Jorgensen's house. Soon after they got there, a fight broke out between Jorgensen and Henry. Critser joined the fight, punching Jorgensen in the head with brass knuckles and choking Jorgensen until he passed out. At that point, Henry ordered Critser to tie Jorgensen's feet together and then go into another room. Critser complied.

After Critser left the room, Henry was alone with Jorgensen for some period of time. At some point, Henderson left. When the State attempted to adduce testimony as to what conversations took place before Henderson left, Henry objected on hearsay grounds. During a discussion outside the presence of the jury, Henry stated that he understood the State's conspirator exclusion to the hearsay rule, but that there was only evidence of a conspiracy to rob Tony, not Jorgensen. The State responded that the conspirators were robbing Jorgensen in order to buy a gun with which to rob Tony, and so it was all in furtherance of the same conspiracy. The court overruled the objection and found that the coconspirator exclusion to the hearsay rule set forth in Neb. Rev. Stat. § 27-801(4)(b) (Reissue 2008) applied. Critser thereafter testified that Henderson said she was leaving to withdraw money from Jorgensen's account with his debit card and that she would be right back.

Henderson returned from the automatic teller machine (ATM) approximately 10 to 15 minutes later. Henderson and Critser joined Henry in the kitchen. Henderson said she had withdrawn $100.

Critser testified that at that time, he witnessed Henry "stab[] Jorgensen in the neck five times." Critser testified that Henry threatened him when Critser "freaked out" about the stabbing, and Critser assured Henry that "you ain't got nothing to worry about." They wiped things down to remove possible fingerprints and left.

The day after the murder, May 18, 2013, Henry and Critser continued to discuss trying to obtain a gun. While taking Critser back to Lincoln, they looked for, but were unable to obtain, a gun in Grand Island. Critser testified that he did not explicitly agree with Henry's plan to go immediately back to Columbus to rob Tony. Still, Critser told Henry that he had a "buddy" he could ask about getting a gun.

During the journey through Grand Island and then to Lincoln, Critser mentioned to Henry the knife left in Jorgensen's neck. Without objection, Critser testified that he and Henry discussed what to do about the knife. Henry determined that he must go back and retrieve the knife, apparently because no one had wiped fingerprints off of it. Critser was going to give Henry the keys to Jorgensen's house that were in the bag containing their bloodstained clothing.

Critser testified that when they arrived in Lincoln, Henry tried unsuccessfully to withdraw money from Jorgensen's debit card at an ATM that did not have video surveillance. Henry left Lincoln, leaving Critser in possession of Jorgensen's debit card. He directed Critser to try after midnight to withdraw money from the account. Critser was also left with a bookbag containing their bloodstained clothes and the keys to Jorgensen's house. Henry told Critser to get rid of the clothes. Henry planned on retrieving the keys, but forgot to do so.

On May 19, 2013, Critser attempted to withdraw cash with Jorgensen's debit card, but was unsuccessful. Later that same

day, Critser tried again to withdraw money with the debit card, but was unsuccessful. Critser testified that he hid Jorgensen's debit card in the bushes outside Benson's apartment and put the clothes in a Dumpster. He eventually threw the keys down different sewers in Lincoln. Critser testified that he did not actively look for a gun.

### (e) Henderson

Henderson also testified against Henry as part of a plea agreement. Henderson's testimony regarding certain details about the events in Columbus differed from Critser's testimony, but she testified to the same general sequence of events: driving to Columbus with Henry to pick up Critser; planning to rob Tony; looking for a gun to use in the robbery; going to Jorgensen's house to obtain money on May 17, 2013; and fighting Jorgensen.

Henderson testified that while Jorgensen was still alive, Henry and Critser extracted Jorgensen's personal identification number from him, and Henry told her to take Jorgensen's debit card to an ATM to make sure it worked. She withdrew $100. Henderson testified that she witnessed Henry stab Jorgensen in the chest multiple times. Henderson admitted that she was the person who stabbed Jorgensen in the neck and left the knife there. Sometime after killing Jorgensen, she saw that Henry had obtained a gun.

### (f) ATM Withdrawals and Discovery
### of Jorgensen's Possessions

The investigating officers obtained Jorgensen's bank records, which showed that on May 17, 2013, at 5:33 p.m., a $400 withdrawal was made and at 8:44 p.m., a $100 withdrawal was made from a Columbus ATM. The receipt for the $400 withdrawal was found in Jorgensen's vehicle, and video confirmed Jorgensen made that withdrawal. But video footage of the $100 withdrawal shows a woman believed to be Henderson making the withdrawal.

Officers found Jorgensen's debit card where Benson reported it to be near her apartment. Another officer retrieved Jorgensen's keys in a storm drain in Lincoln.

### (g) Text Messages

The State entered into evidence text messages between Benson's cell phones and Henry's alleged cell phone. It offered the exhibits containing the text messages after the testimony of Benson, the witness who found what was purported to be Henry's cell phone abandoned at a post office, and the forensic investigators who extracted the text messages from the cell phones.

Benson had testified that at the time of the murder, she had a different cell phone from a second one she later obtained. She stated that while Critser was in Columbus, he communicated with Benson through the number that Critser had been texting to before he left, which she understood to be Henry's cell phone. At one point, Benson called that number and Henry answered. She testified that Henry then handed the cell phone to Critser.

Corey Weinmaster, the police officer who conducted the forensic examination of Benson's old cell phone, testified that around the time of Jorgensen's death, numerous text messages were exchanged between Benson's old cell phone and cell phone number 402-367-8802. The cell phone with the 402-367-8802 number was found abandoned at the Columbus post office after one of the persons interviewed by investigating officers suggested they look there. An employee of the post office stated that the last number dialed from the 402-367-8802 number was a contact labeled "Cowboy." She called that number, and a man saying his name was "Cowboy" claimed ownership of the cell phone.

The parties stipulated that stored text messages had been retrieved from Benson's old cell phone and from the cell phone with the 402-367-8802 number. They stipulated that the cell phones were in the same condition when examined

as when retrieved by law enforcement. Through forensic examination, each message offered into evidence identified the sending cell phone number, receiving number, date, time, and content.

Exhibit 84 was a chart that was prepared by Weinmaster. It included the contents of the text messages sent between Benson's old cell phone and the 402-367-8802 number. These messages were dated between May 15 and 25, 2013.

Exhibit 86 was a chart prepared by Angela Bell, the State Patrol officer who conducted the forensic examination of the cell phone with the 402-367-8802 number. Although Bell retrieved all the text messages stored on the cell phone, exhibit 86 purportedly contained only those text messages sent between the 402-367-8802 number and Benson's new cell phone. These messages were dated between May 20 and 22, 2013. For reasons that are not fully explained by the record, all of the messages in exhibit 86 are also found within exhibit 84.

Exhibits 83 and 90 were received into evidence for foundational purposes only and were never seen by the jury. Exhibit 83 was a printout of the contents of every text message retrieved from Benson's old cell phone. These messages were dated between December 31, 2012, and May 29, 2013. Exhibit 90 contained two compact discs. The first disc was the digital version of exhibit 83. The second disc was the digital version of exhibit 84.

Weinmaster and Bell confirmed that they had prepared the exhibits and explained how they retrieved the text messages from the cell phones.

Benson was specifically asked to look at exhibit 84, and she confirmed that the text messages shown in the exhibit were the messages that she saw between Critser and Henry regarding the plans for a robbery in Columbus.

Henry elicited testimony from Weinmaster and Bell that they could not be sure who was actually typing the text messages from someone's cell phone. Moreover, certain programs

could allow someone to send a text message from one cell phone but make it appear that the message had been sent from another cell phone.

Henry objected to all text message evidence in its entirety. He asserted there was a lack of foundation establishing that the texts were in fact between Henry and Benson's cell phones and to the extent they were "going to start putting names on phones." And, principally, Henry argued that the State could not verify who sent the text messages.

Henry also made a generalized hearsay objection to all the text messages, but there was no discussion on the record as to what particular statements Henry contended were inadmissible under such objection or why. At one point, Henry's counsel said his objection was "still . . . foundation and hearsay based on the fact that [Bell] cannot identify what phone, if it's even a correct number, that this comes from at this time or who sent it." The district court overruled Henry's objections to the exhibits.

Later, at the time of Critser's testimony, Henry further objected to the text messages based on the rule of completeness. Though he had not raised such a specific objection prior to the exhibits' admission, Henry had previously argued that if any text messages were to be deemed admissible, exhibit 83 was the more "appropriate" exhibit to go to the jury, because it did not have labels of names of cell phones and it contained all the text messages. Henry also objected to Critser's testimony referencing the text messages, on the grounds of foundation, hearsay, and the rule of completeness. None of the objections were discussed. The objections were generally overruled.

The State used the text messages extensively in its examination of Critser. And, during his testimony, Critser generally recognized that the text messages accurately represented his communications with Henry regarding the plan to rob Tony and the attempts to cover up the murder of Jorgensen. Critser interpreted some of the slang and code words found in the messages for the jury.

In the text messages sent before Jorgensen's murder, Henry and Critser discussed the planned robbery; the need to obtain a gun, because the intended robbery victim also had a gun; and the arrangements to pick up Critser. After Jorgensen's murder, Henry and Critser discussed via text messages the need to either hide the keys to Jorgensen's house or retrieve them in order to enter Jorgensen's house and remove the knife from Jorgensen's body, Critser's suggestion that Henry burn Jorgensen's house down, Critser's communication to Henry that he had taken care of "'the bag'" containing bloodstained clothing, Critser's complaints about whether he was going to get any money, Henry's suggestion that Critser keep trying to withdraw money using Jorgensen's debit card, whether Critser had been able to get the "'thing'" from his "'homi'" (which Critser explained referred to getting a gun), and Henry's assurances that he was working on getting Critser money. There was also entered into evidence several text messages between Critser and Benson concerning their argument about Critser's leaving with Henry to commit a robbery.

Henry cross-examined Critser extensively about how he could be certain the text messages were in fact from Henry. Critser confirmed that there was no doubt in his mind that the text messages coming from cell phone number 402-367-8802 came from Henry.

### (h) Condreay

The State called Cory Condreay to testify regarding several statements Henry made after Jorgensen's death. Condreay was present at the house where Henry, Critser, and Henderson stayed the night following the murder. Condreay testified without objection that Henry told Condreay (1) that Henry, Critser, and Henderson had gone to Jorgensen's "to rob him of his ATM card on his payday"; (2) that they "beat [Jorgensen] so bad that he was speaking incoherently"; and (3) that at some point during the fight, Henry stabbed and killed Jorgensen.

One to three days later, Condreay drove with Henry to Jorgensen's house, because Henry wanted to break into the house and extract the knife from Jorgensen's body. But Condreay refused to try to break down the door of the house, even when Henry threatened Condreay with a gun that Henry had apparently recently acquired from "Cowboy." Henry was never able to gain entry into Jorgensen's house.

### 4. Verdict and Sentencing

At the conclusion of trial, the jury returned verdicts of guilty on the counts of felony murder, use of a deadly weapon to commit a felony, and conspiracy to commit robbery. The jury found Henry not guilty of possession of a deadly weapon by a prohibited person. On April 16, 2014, the district court entered judgment in accordance with the verdicts.

Henry filed a motion for new trial. He alleged irregularity in the proceedings and insufficiency of the evidence. He also alleged that the district court had erred in failing to exclude Bowen's testimony, in allowing evidence of the text messages without proper foundation, in permitting exhibits 84 and 86 to go to the jury room, and in instructing the jury.

On May 20, 2014, the district court overruled Henry's motion for new trial. The court sentenced him to life imprisonment on the felony murder conviction, 40 to 50 years' imprisonment on the use conviction, and 10 to 20 years' imprisonment on the conspiracy conviction. The court ordered the sentences to be served consecutively. Henry appeals.

## III. ASSIGNMENTS OF ERROR

Henry assigns, restated and consolidated, that the district court erred in (1) giving jury instruction No. 2; (2) overruling his motion in limine and allowing the State's pathologist to testify to the results of the autopsy at trial; (3) overruling his motion for a bill of particulars; (4) failing to sustain his motion to sever; (5) failing to sustain his motion for new trial; (6) admitting exhibits 83, 84, and 86; (7) allowing exhibits 84 and 86 to go to the jury room; (8) allowing the State to make

an assumption during questioning that Henry was sending certain text messages; and (9) allowing the State's witnesses to speculate as to what certain text messages meant.

## IV. STANDARD OF REVIEW

[1] Whether a jury instruction is correct is a question of law, regarding which an appellate court is obligated to reach a conclusion independent of the determination reached by the trial court.[1]

[2] In determining the correctness of a trial court's ruling on a motion to suppress, the appellate court will uphold the trial court's findings of fact unless they are clearly wrong, but will reach a conclusion independent of that reached by the trial court with regard to questions of law.[2]

[3] Unless granted as a matter of right under the Constitution or other law, discovery is within the discretion of a trial court, whose ruling will be upheld on appeal unless the trial court has abused its discretion.[3]

[4] The decision of the trial court granting or denying a motion for a bill of particulars requested by the accused will not be reversed by the appellate court in the absence of an abuse of discretion on the part of the trial court in making its adjudication.[4]

[5] A denial of a motion to sever will not be reversed unless clear prejudice and an abuse of discretion are shown, and an appellate court will find such an abuse only where the denial caused the defendant substantial prejudice amounting to a miscarriage of justice.[5]

[6,7] In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the

---

[1] *State v. Schmidt*, 276 Neb. 723, 757 N.W.2d 291 (2008).

[2] See *State v. Shurter*, 238 Neb. 54, 468 N.W.2d 628 (1991).

[3] *State v. Henderson*, 289 Neb. 271, 854 N.W.2d 616 (2014).

[4] See Annot., 5 A.L.R.2d 444 (1949).

[5] See *State v. Foster*, 286 Neb. 826, 839 N.W.2d 783 (2013).

Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility.[6] Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion.[7]

[8] A trial court does not have discretion to submit testimony materials to the jury for unsupervised review, but the trial court has broad discretion to submit to the jury nontestimonial exhibits, in particular, those constituting substantive evidence of the defendant's guilt.[8]

[9] The manner in which a witness may be examined is within the sound discretion of the court.[9]

## V. ANALYSIS

### 1. Assignment of Error No. 1

Henry assigns that the district court erred in giving jury instruction No. 2, which was based on NJI2d Crim. 9.2. It stated as follows:

> As I told you at the beginning of the trial, this is a criminal case in which the State of Nebraska has charged [Henry] with the following four crimes: felony murder; use of a deadly weapon to commit a felony; possession of a deadly weapon by a prohibited person; and criminal conspiracy to commit robbery. The fact that the State has brought these charges is not evidence of anything. The charges are simply an accusation, nothing more.
>
> [Henry] has pleaded not guilty. He is presumed to be innocent. That means you must find him not guilty unless and until you decide that the State has proved him guilty beyond a reasonable doubt.

---

[6] *State v. Russell*, 292 Neb. 501, ___ N.W.2d ___ (2016).

[7] *Id.*

[8] *State v. Castaneda*, 287 Neb. 289, 842 N.W.2d 740 (2014).

[9] *Ederer v. Van Sant*, 184 Neb. 774, 172 N.W.2d 96 (1969).

Henry argues that jury instruction No. 2 was prejudicial and violated his due process rights, because the words "'and until'" in the last sentence "presume[d] a finding of guilty."[10] He does not object to any other language in the instruction.

[10,11] In considering the propriety of giving jury instruction No. 2, we apply well-known principles of law. The appellant has the burden to show that a questioned jury instruction prejudiced him or otherwise adversely affected his substantial rights.[11] All the jury instructions must be read together, and if, taken as a whole, they correctly state the law, are not misleading, and adequately cover the issues supported by the pleadings and the evidence, there is no prejudicial error necessitating reversal.[12]

In the instant case, when read as a whole, the jury instructions correctly stated the law regarding the presumption of innocence, adequately covered the issue, and were not misleading. Jury instruction No. 2 clearly stated that Henry was "presumed to be innocent" and that the jury was required to find him not guilty "unless" the State proved him guilty beyond a reasonable doubt. These statements were not negated by the inclusion of the words "and until," nor did such words create confusion. To the contrary, the U.S. Supreme Court has employed the phrase "unless and until" when explaining the presumption of innocence.[13] In light of this fact, we reject Henry's argument that the words "and until" created a presumption of guilt or otherwise made jury instruction No. 2 improper. This assignment of error lacks merit.

## 2. Assignment of Error No. 2

Henry assigns that the district court erred in allowing Bowen, who performed the autopsy of Jorgensen's body, to

---

[10] Brief for appellant at 31.

[11] *State v. Loyuk*, 289 Neb. 967, 857 N.W.2d 833 (2015).

[12] *Id.*

[13] See *Clark v. Arizona*, 548 U.S. 735, 766, 126 S. Ct. 2709, 165 L. Ed. 2d 842 (2006).

testify at the trial. Henry challenges Bowen's testimony only on the ground that it was inadmissible under § 29-1913. Henry argues that because the body was cremated, evidence of the autopsy and cause of death should not have been admitted at trial. In addition, Henry refers to the "graphic and gruesome" photographs that were received into evidence during Bowen's testimony.[14]

### (a) Statutory Scheme

Section 29-1913 provides as follows:

(1) When in any felony prosecution or any prosecution for a misdemeanor or a violation of a city or village ordinance for which imprisonment is a possible penalty, the evidence of the prosecuting authority consists of *scientific tests or analyses of ballistics, firearms identification, fingerprints, blood, semen, or other stains, upon motion of the defendant* the court where the case is to be tried *may order* the prosecuting attorney to make available to the defense *such evidence* necessary to allow the defense to conduct *like tests or analyses with its own experts.* . . .

(2) If the evidence necessary to conduct the tests or analyses by the defense is unavailable because of the neglect or intentional alteration by representatives of the prosecuting authority, other than alterations necessary to conduct the initial tests, the tests or analyses by the prosecuting authority *shall* not be admitted into evidence.

(Emphasis supplied.)

Section 29-1913 is part of a series of discovery statutes. The principal and broader discovery statute, Neb. Rev. Stat. § 29-1912(1)(e) (Cum. Supp. 2014) provides that the defendant may request an order permitting the defendant to inspect and copy, among other things, the "results and reports of

---

[14] Brief for appellant at 34.

physical or mental examinations, and of scientific tests, or experiments made in connection with the particular case." Under § 29-1912(2), the court "may" issue such a discovery order considering, in the exercise of its discretion, several listed factors. Neb. Rev. Stat. § 29-1919 (Reissue 2008) provides that if a party fails to comply with a court's order pursuant to Neb. Rev. Stat. §§ 29-1912 to 29-1921 (Reissue 2008 & Cum. Supp. 2014), the court "may," "[p]rohibit the party from calling a witness not disclosed or introducing in evidence the material not disclosed"[15] or issue such other order as it deems just under the circumstances.[16]

Section 29-1913 is unique insofar as it contains both discretionary elements and matters of right. From the plain usage of the term "may," whether to grant the requested discovery order under § 29-1913(1) is a matter of discretion, just as any other order of discovery under § 29-1912.[17] But, unlike the "may" language of § 29-1919, which applies generally to failure to comply with discovery orders, § 29-1913 states that the court "shall" not admit the prosecuting authority's tests or analyses described in subsection (1), "[i]f the evidence necessary to conduct the tests or analyses by the defense is unavailable because of the neglect or intentional alteration by representatives of the prosecuting authority, other than alterations necessary to conduct the initial tests . . . ."[18] Under this plain language, exclusion of the described tests or analyses is a mandatory sanction for violation of the discovery order issued under § 29-1913, in the event of unavailability due to neglect or intentional alteration as described in the statute.

---

[15] § 29-1919(3).

[16] § 29-1919(4).

[17] See, *Christiansen v. County of Douglas*, 288 Neb. 564, 849 N.W.2d 493 (2014); *State v. Hense*, 276 Neb. 313, 753 N.W.2d 832 (2008); *State v. County of Lancaster*, 272 Neb. 376, 721 N.W.2d 644 (2006).

[18] § 29-1913(2).

(b) Plain Language of § 29-1913 Does
Not Include Testing of Bodies

The State argues that § 29-1913 is plainly limited to "scientific tests or analyses of ballistics, firearms identification, fingerprints, blood, semen, or other stains," and does not apply to the testing of bodies. We agree that the plain language of § 29-1913 does not encompass the testing of bodies, as such.

We have little case law discussing § 29-1913. What case law we have almost exclusively concerns tests of blood, which are encompassed by the plain language of the statute.[19]

Henry points out that in *State v. Brodrick*,[20] we applied § 29-1913 to the analysis of a drug tablet, which is not an item listed in the statute. We held that the court erred in denying the defendant's motion to suppress the testimony of the chemist who determined that a tablet consisted of a controlled substance. Prior to the motion to suppress, the defendant had moved for a discovery order to permit him to have an independent analysis conducted on the tablet.[21] But the tablet had been discarded by the chemist, despite the fact that the chemist had been asked by the county attorney to preserve part of the tablet if possible. It was undisputed that it would have been possible to preserve the tablet. We concluded that the destruction of the tablet constituted neglect under § 29-1913.

In contrast to *Brodrick*, however, in *State v. Batchelor*,[22] we conducted our analysis under §§ 29-1912 and 29-1919 to determine whether a chemical test of a tablet should have been suppressed. We found that where the evidence was conflicting as to whether the chemist could have preserved the tablet determined to be a controlled substance, the trial

---

[19] See, *State v. Peterson*, 242 Neb. 286, 494 N.W.2d 551 (1993); *State v. Tanner*, 233 Neb. 893, 448 N.W.2d 586 (1989).

[20] *State v. Brodrick*, 190 Neb. 19, 205 N.W.2d 660 (1973). See, also, *State v. Batchelor*, 191 Neb. 148, 214 N.W.2d 276 (1974).

[21] *State v. Brodrick, supra* note 20.

[22] *State v. Batchelor, supra* note 20.

court did not abuse its discretion in denying the motion to suppress.[23]

In *State v. Davlin*,[24] we expressed doubt as to whether a victim's larynx, extracted during an autopsy of the victim's body, fell within the purview of § 29-1913. In a case where the victim's cause of death was at issue, the defendant had sought suppression of the victim's autopsy, because the State had lost the victim's larynx after the autopsy was conducted. But we held that by not properly objecting below, the defendant in *Davlin* had waived any issue under § 29-1913.

We also noted in dicta that while the defendant sought to exclude the entirety of the autopsy evidence, the statutory language clearly refers to exclusion of "tests or analyses" performed on the evidence that is unavailable to the defense.[25] We said that "even if the unavailable evidence . . . was within the scope of § 29-1913," the remedy would be exclusion of the tests or analyses of the unavailable evidence, not of the entire autopsy.[26]

We explained that "[t]he effect of § 29-1913(2) is to level the playing field when evidence is unavailable and prevent the prosecuting authority from making use of evidence that was not available to the defense."[27] And the tests or analyses presented by the State at trial did not rely on the missing larynx. The pathologist determined the victim's cause of death by relying on blood tests and the examination of body parts other than the larynx.[28]

[12] We will not read into a statute a meaning that is not there,[29] and there are logical reasons the Legislature would

---

[23] *Id.* See, also, *State v. Peterson, supra* note 19.

[24] *State v. Davlin*, 263 Neb. 283, 639 N.W.2d 631 (2002).

[25] *Id.* at 298, 639 N.W.2d at 646.

[26] *Id.*

[27] *Id.*

[28] *Id.*

[29] *State v. Yos-Chiguil*, 281 Neb. 618, 798 N.W.2d 832 (2011).

have intended the tests or analyses encompassed by § 29-1913 to be limited to tests or analyses of "ballistics, firearms identification, fingerprints, blood, semen, or other stains." Particularly, there are reasons why the Legislature would not have intended this statute to apply to bodies.

Unlike other evidence, a person's body is uniquely connected to the emotional feelings of the deceased's relatives, who wish to dispose of their loved one's remains as they see fit, rather than preserve them for duplicative tests or analyses.[30] Cremation of a body may be an "intentional alteration by representatives of the prosecuting authority,"[31] but considerations are at play in doing so at the behest of the victim's family, which considerations are not present with "ballistics, firearms identification, fingerprints, blood, semen, or other stains."[32]

Also, unlike "ballistics, firearms identification, fingerprints, blood, semen, or other stains," a body will naturally deteriorate and is difficult to preserve as a whole unit. Conservation should be required only of those individual body parts or samples that the State intends to offer tests of and that are capable of being specially preserved in order to retest or reanalyze them in a manner similar to those items listed by the statute. Most of such parts or samples, of course, actually are "fingerprints, blood, semen, or other stains."

### (c) Mandatory Suppression Is Not Triggered Absent Discovery Motion

[13] But even if § 29-1913 were to apply to a body or any of its parts that are not "fingerprints, blood, semen, or other stains," we agree with the State that there was no obligation for the district court to suppress the evidence without a motion by Henry that the specific evidence be made available to conduct like tests or analyses. For, in the absence of any discovery

---

[30] See *People v. Vick*, 11 Cal. App. 3d 1058, 90 Cal. Rptr. 236 (1970).

[31] See § 29-1913(2).

[32] See § 29-1913(1).

motion under § 29-1913(1), there is no discovery order, and without a discovery order, there can be no violation requiring suppression of the evidence.

We can find no case wherein we have reached a holding under § 29-1913, and the defendant had failed to file a motion under § 29-1913(1) to make available to the defense the evidence necessary to conduct like tests or analyses. To the contrary, in cases decided under § 29-1913, the defendant's motion for discovery of the relevant evidence and the corresponding discovery order is explicitly noted in our analysis.[33]

Indeed, in *State v. Tanner*,[34] we said that because the defendant failed to demand that the blood sample be produced, which was allegedly coagulated and untestable for unknown reasons, the defendant waived production of the sample and the corresponding sanctions under § 29-1913(2).

In *Batchelor*,[35] decided under §§ 29-1912 and 29-1919, we similarly found decisive that the defendant failed to specifically request discovery of a graph produced as part of the chemical testing, which the State had failed to preserve. We explained that the defendant could not obtain suppression of the chemical test based on the destruction of a graph that was not subject to a discovery motion.[36]

Henry argues that a motion for discovery under § 29-1913(1) would have been futile, because Jorgensen's body had been cremated before Henry was charged with the murder and appointed an attorney. Since it would have been impossible for the State to comply with any discovery order issued in response to a motion under § 29-1913(1), Henry argues that a motion under § 29-1913(1) was not a necessary prerequisite to the mandatory sanctions under § 29-1913(2).

---

[33] See, *State v. Peterson, supra* note 19; *State v. Tanner, supra* note 19; *State v. Brodrick, supra* note 20. But see *State v. Davlin, supra* note 24.

[34] *State v. Tanner, supra* note 19.

[35] *State v. Batchelor, supra* note 20.

[36] *Id.*

[14] We find no merit to Henry's futility argument. Section 29-1913(1) plainly states that a discovery order may be issued "upon motion of the defendant." We will not conclude that because the State in good faith destroyed evidence before a defense discovery motion under § 29-1913 could be made, the district court was obliged to suppress the State's tests or analyses under § 29-1913(2) without any motion for discovery under § 29-1913(1).

Without a discovery motion under § 29-1913(1), the trial court cannot know the precise issue presented and make the necessary factual findings in determining whether an order of discovery should be granted. And, without a proper discovery order and a claim of the violation of such order being brought to the court's attention, the court cannot properly determine whether the evidence subject to the order was, in fact, unavailable and whether it was unavailable due to neglect or intentional alteration.

[15] Simply put, the mandatory sanction of suppression provided for under § 29-1913(2) cannot be triggered unless these discretionary determinations have first been made upon a proper motion. Thus, a discovery motion under § 29-1913(1) is a prerequisite for sanctions under § 29-1913(2). A suppression motion cannot serve as a substitute for a discovery motion.[37]

### (d) Trial Court Did Not Abuse Its Discretion in Denying Motion to Suppress

Particularly here, without a proper discovery motion under § 29-1913(1), the court and the State were left to guess what similar tests Henry wished his experts to conduct. Henry sought to suppress all evidence derived from the autopsy, but without an appropriate motion, it was unclear what tests Henry sought to retest or reanalyze, or whether some individual body part or fluid was Henry's real object.

---

[37] See *id.*

It was unclear whether Henry contested Jorgensen's cause of death. The ultimate scientific analysis entered into evidence as a result of the autopsy was that Jorgensen died of multiple stab wounds. Henry did not contest that Jorgensen was stabbed multiple times or that he bled profusely as a result. And these facts were confirmed by the testimony of the officers who arrived at the scene and by the photographs they took. In denying Henry's motion under § 29-1913(1), the court noted that after having appointed Henry an independent pathologist and given full access to Bowen's report, the autopsy photographs, and any evidence retained by Bowen as a result of the autopsy, Henry did not contest Jorgensen's cause of death.

Henry failed to explain how reanalysis of Jorgensen's body could have led to a different determination. Henry's pathologist certainly did not indicate that the absence of the body hindered the pathologist's determination of cause of death. While there was methamphetamine found in Jorgensen's decomposition fluids, the State pathologist's determination of Jorgensen's cause of death did not depend on the chemical tests of the decomposition fluids. Rather, Bowen determined that based on the amount of hemorrhaging from the stab wounds, Jorgensen was alive at the time he was stabbed and that therefore, he did not die from methamphetamine.

Having concluded that the mandatory sanctions of § 29-1913(2) were not triggered, Henry's motion to suppress was a matter within the court's discretion.[38] Henry failed to provide sufficient grounds upon which we could conclude that the district court abused its discretion in denying the motion to suppress. We find no merit to Henry's second assignment of error.

### 3. Assignment of Error No. 3

Henry assigns that the district court erred in overruling his motion for a bill of particulars by which he sought to know

---

[38] See *State v. Henderson, supra* note 3.

the names of the "'potential robbery victim or victims'" mentioned in count IV of the amended information. He argues that without identifying the victim or victims, the language of the information was not sufficient to charge him with conspiracy to commit robbery. We do not agree.

[16] We have stated that where an information alleges the commission of a crime using language of the statute defining that crime or terms equivalent to such statutory definition, the charge is sufficient.[39] Neb. Rev. Stat. § 28-202(1) (Reissue 2008), which defines criminal conspiracy, states:

A person shall be guilty of criminal conspiracy if, with intent to promote or facilitate the commission of a felony:

(a) He agrees with one or more persons that they or one or more of them shall engage in or solicit the conduct or shall cause or solicit the result specified by the definition of the offense; and

(b) He or another person with whom he conspired commits an overt act in pursuance of the conspiracy.

Significantly, this definition refers to the conduct and result "specified by the definition of the offense" to which the persons have conspired to commit, but it does not mention the identity of the victim of the underlying offense.[40]

[17] We additionally note that this court has established that it is not necessary to a charge of robbery to name the alleged victim.[41] In *State v. Smith*,[42] we specifically rejected the argument that the charge for robbery in an information was insufficient because it failed to indicate the victim of the alleged robbery. Therefore, in order to allege the existence of an

---

[39] See *State v. Davlin*, 272 Neb. 139, 719 N.W.2d 243 (2006).

[40] See *id.*

[41] See, *State v. Smith*, 269 Neb. 773, 696 N.W.2d 871 (2005); *State v. Nicholson*, 183 Neb. 834, 164 N.W.2d 652 (1969).

[42] *State v. Smith, supra* note 41.

agreement to commit robbery, it was not necessary to identify the alleged victim or victims of such robbery.[43]

In the instant case, count IV of the amended information used the language of § 28-202(1) to charge Henry with criminal conspiracy to commit robbery. It alleged that "with the intent to promote or facilitate the commission of felony robbery," he "agree[d] with one or more persons to engage in the result specified by the definition of the offense of robbery" and that "he or another person with whom he conspired committed an overt act in pursuance of the conspiracy." This language corresponded to that of § 28-202(1) and was thus sufficient to charge Henry with criminal conspiracy to commit robbery.[44] The district court did not err in overruling Henry's motion for a bill of particulars.

### 4. Assignment of Error No. 4

Henry assigns that the district court erred in overruling his motion to sever count IV from the other three counts for trial. The joinder or separation of charges for trial is governed by Neb. Rev. Stat. § 29-2002 (Reissue 2008), which states, in relevant part:

> (1) Two or more offenses may be charged in the same indictment, information, or complaint in a separate count for each offense if the offenses charged, whether felonies or misdemeanors, or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.
>
> . . . .
>
> (3) If it appears that a defendant or the state would be prejudiced by a joinder of offenses in an indictment, information, or complaint . . . the court may order an election for separate trials of counts, indictments,

---

[43] *Id.*

[44] See *State v. Davlin, supra* note 39.

informations, or complaints, grant a severance of defend-
ants, or provide whatever other relief justice requires.

Under § 29-2002, whether offenses were properly joined
involves a two-stage analysis in which we first determine
whether the offenses were related and joinable and then deter-
mine whether an otherwise proper joinder was prejudicial to
the defendant.[45]

(a) Offenses Properly Joinable

The first question is whether count IV, which alleged a con-
spiracy to commit robbery, was properly joinable with counts
I, II, and III, which related to Jorgensen's murder. Offenses are
properly joinable under § 29-2002(1) if they "'are of the same
or similar character or are based on the same act or transaction
or on two or more acts or transactions connected together or
constituting parts of a common scheme or plan.'"[46]

Henry argues that count IV "was completely separate and
apart from the other counts of the Information," because it
related to the conspiracy to rob a person named "Tony" and
not to Jorgensen.[47] But the testimony at trial established that
Jorgensen's murder and the conspiracy to rob Tony were not
unrelated but were in fact "connected together" and "parts of a
common scheme or plan."[48] Critser testified that they went to
Jorgensen's house in order to obtain the money they needed to
buy a gun to use in the robbery of Tony. In other words, the
plan to go to Jorgensen's house developed from the conspiracy
to rob Tony. Accordingly, count IV was properly joinable with
counts I, II, and III.

---

[45] See *State v. Knutson*, 288 Neb. 823, 852 N.W.2d 307 (2014), *cert. denied*
___ U.S. ___, 135 S. Ct. 1505, 191 L. Ed. 2d 442 (2015).

[46] *Id.* at 830, 852 N.W.2d at 316. See, also, *State v. Rocha*, 286 Neb. 256,
836 N.W.2d 774 (2013).

[47] Brief for appellant at 43.

[48] See § 29-2002(1).

### (b) Joinder Not Prejudicial

Even if offenses are properly joinable, § 29-2002(3) provides that severance may be granted if the joinder would be prejudicial. A defendant opposing joinder of charges has the burden of proving prejudice.[49]

Henry argues that he was prejudiced by having count IV tried with the other counts for only one reason: It allowed the State to adduce evidence that would not have been relevant in a separate trial on counts I, II, and III, namely, the text messages. But this claim is not supported by the facts. The plan to go to Jorgensen's developed from the conspiracy to rob Tony, which itself developed by text message and in-person conversations. Thus, even though the text messages do not mention Jorgensen, they would have been relevant in a separate trial of counts I, II, and III. The joinder of offenses did not prejudice Henry by allowing for the introduction of the text messages.

Severance is not a matter of right, and a ruling of the trial court with regard thereto will not be disturbed on appeal absent a showing of prejudice to the defendant.[50] Henry has failed to establish that he was prejudiced by the otherwise proper joinder of count IV to the other offenses. We thus conclude that the district court did not err in overruling his motion to sever.

### 5. ASSIGNMENT OF ERROR NO. 5

Henry assigns, but does not argue, that the district court erred in failing to grant a new trial. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[51] Therefore, we do not consider this assignment of error.

---

[49] See *State v. Knutson, supra* note 45.

[50] *State v. Hilding*, 278 Neb. 115, 769 N.W.2d 326 (2009).

[51] *State v. Cook*, 290 Neb. 381, 860 N.W.2d 408 (2015).

6. Assignment of Error No. 6

Henry assigns that the district court erred in admitting exhibits 83, 84, and 86. He does not appear to challenge exhibit 90. Exhibit 90 was admitted for foundational purposes only, and it was never seen by the jury. Exhibit 83 is simply a printout of the first compact disc of exhibit 90, and it was likewise entered into evidence for foundational purposes only. Because it was never seen by the jury and it does not affect our analysis of the admissibility of exhibits 84 and 86, we will not address whether the court erred in "admitting" exhibit 83.

(a) Foundation

[18] Henry objected to the exhibits principally on the ground of foundation, and that is his principal argument on appeal. A growing body of case law has developed concerning the admissibility of text messages.[52] Generally, the foundation for the admissibility of text messages has two components: (1) whether the text messages were accurately transcribed and (2) who actually sent the text messages.[53]

Henry did not seem to dispute at trial that the text messages were accurately transcribed from the cell phone numbers identified in the exhibits, other than to the extent he asserted "text spoofing" could misidentify the sending cell phone number. We find the testimony of Bell and Weinmaster was sufficient to authenticate the exhibits under Neb. Rev. Stat. § 27-901 (Reissue 2008) as accurate transcriptions of the text messages from the two cell phones examined. We find no merit to Henry's argument that there was insufficient authentication of the exhibits, because Bell and Weinmaster were "only

---

[52] See, *U.S. v. Barnes*, 803 F.3d 209 (5th Cir. 2015); *State v. Elseman*, 287 Neb. 134, 841 N.W.2d 225 (2014); *State v. Koch*, 157 Idaho 89, 334 P.3d 280 (2014); *State v. Otkovic*, 322 P.3d 746 (Utah App. 2014); *Gulley v. State*, 2012 Ark. 368, 423 S.W.3d 569 (Oct. 4, 2012); *State v. Thompson*, 777 N.W.2d 617 (N.D. 2010); *State v. Franklin*, 280 Kan. 337, 121 P.3d 447 (2005); Annot., 34 A.L.R.6th 253 (2008).

[53] See *State v. Thompson, supra* note 52.

familiar with one phone and one phone number and had no actual knowledge of what the other phone or phone number contained."[54]

Henry claims there was not sufficient foundation that he in fact sent the text messages attributed to him. Specifically, Henry points out the lack of evidence that he was the record owner of the cell phone corresponding to the number 402-367-8802 and the facts that the cell phone corresponding to that number was found in a post office dropbox and that a person named "Cowboy" claimed ownership of the cell phone. Further, Henry points out that a sender of a text message can, through "text spoofing," make it appear that the text message was sent from one cell phone number when it was actually sent from another number.

[19] In similar cases, testimony concerning context or familiarity with the manner of communication of the purported sender is sufficient foundation for the identity of the sender of the message.[55] Such testimony is typically in combination with testimony that the cell phone number belonged to or was regularly utilized by the alleged sender.[56] The proponent of the text messages is not required to conclusively prove who authored the messages.[57] The possibility of an alteration or misuse by another generally goes to weight, not admissibility.[58]

Despite the fact that the cell phone was found in a post office and there was no record ownership established, there was testimony at trial identifying Henry as the regular user of the cell phone number in question. Critser testified that he had programmed that number under the name "E." Benson

---

[54] Brief for appellant at 47.

[55] See, e.g., *State v. Franklin, supra* note 52.

[56] See, *U.S. v. Barnes, supra* note 52; *State v. Koch, supra* note 52; *State v. Otkovic, supra* note 52; *Gulley v. State, supra* note 52; *State v. Blake*, 2012 Ohio 3124, 974 N.E.2d 730 (2012).

[57] See *State v. Elseman, supra* note 52.

[58] See *id.*

testified that Henry answered when she called that number. Furthermore, the identity of Henry as the sender of the messages was sufficiently established through Critser's testimony that he knew the messages were from Henry by their context and familiarity with how Henry talked.

The district court did not abuse its discretion in overruling Henry's foundation objections to the text messages.

### (b) Hearsay

Henry also asserts that the text messages were inadmissible hearsay. Our analysis of this assertion is complicated by the fact that Henry made just one general hearsay objection to the exhibits as a whole without any discussion of what particular statements were inadmissible under such objection and why. It was unclear whether Henry even drew any meaningful distinction between his foundation and his hearsay objections. Thus, the parties and the court did not discuss Henry's hearsay objection, and the court generally overruled the hearsay objection without elaboration and without making any explicit findings of fact.

[20,21] It is generally sufficient to make a general hearsay objection to a specific statement, but a general hearsay objection to the entirety of a witness' testimony or to multiple statements in an exhibit, each admissible or objectionable under differing theories, is not usually sufficient to preserve the hearsay objection.[59] Rather, the opponent to the evidence must identify which statements are objectionable as inadmissible hearsay.[60]

---

[59] See, *State v. Gutierrez*, 272 Neb. 995, 726 N.W.2d 542 (2007), *abrogated on other grounds, State v. Thorpe*, 280 Neb. 11, 783 N.W.2d 542; *McMartin v. State*, 95 Neb. 292, 145 N.W. 695 (1914); *Moyer v. State*, 948 S.W.2d 525 (Tex. App. 1997); *Thompson v. State*, 589 So. 2d 1013 (Fla. App. 1991); *State v. Brown*, 310 Or. 347, 800 P.2d 259 (1990); *Jackson v. State*, 213 Ga. 275, 98 S.E.2d 571 (1957).

[60] See, *McMartin v. State, supra* note 59; *Moyer v. State, supra* note 59; *Thompson v. State, supra* note 59; *State v. Brown, supra* note 59; *Jackson v. State, supra* note 59.

Unless an objection to offered evidence is sufficiently specific to enlighten the trial court and enable it to pass upon the sufficiency of such objections and to observe the alleged harmful bearing of the evidence from the standpoint of the objector, no question can be presented therefrom on appeal.[61]

[22-24] Once the proponent of evidence shows that the proposed evidence is relevant and competent, it is presumptively admissible.[62] It is the party objecting to the evidence as hearsay who bears the burden of production and persuasion that the objected-to evidence is in fact hearsay.[63] Once the opponent demonstrates the evidence is hearsay, the burden shifts to the proponent to lay the foundation for one of the exceptions to the hearsay rule.[64] Neither the trial court nor the appellate court are obliged to sort the statements out on the opponent's behalf.[65] And where the reason for the trial court's overruling of a hearsay objection is left at large, arguably, it is the opponent's burden to demand an explanatory ruling.[66]

[25] Henry's hearsay objection was thus arguably waived. But we conclude, in any case, that the text messages were properly admitted into evidence. Regardless of whether the proponent or the trial court articulated no theory or the wrong theory of admissibility, an appellate court may affirm the

---

[61] *State v. Gutierrez, supra* note 59.

[62] See, Neb. Rev. Stat. § 27-402 (Reissue 2008); G. Michael Fenner, *Evidence Review: The Past Year in the Eighth Circuit, Plus Daubert*, 28 Creighton L. Rev. 611 (1995).

[63] G. Michael Fenner, The Hearsay Rule 58 (2003).

[64] See, e.g., *Idaho v. Wright*, 497 U.S. 805, 110 S. Ct. 3139, 111 L. Ed. 2d 638 (1990); *American Automotive Accessories, Inc. v. Fishman*, 175 F.3d 534 (7th Cir. 1999); *U.S. v. Samaniego*, 187 F.3d 1222 (10th Cir. 1999); *Bemis v. Edwards*, 45 F.3d 1369 (9th Cir. 1995).

[65] See, *McMartin v. State, supra* note 59; *Moyer v. State, supra* note 59; *Thompson v. State, supra* note 59; *State v. Brown, supra* note 59; *Jackson v. State, supra* note 59.

[66] See *Shepard v. United States*, 290 U.S. 96, 54 S. Ct. 22, 78 L. Ed. 196 (1933).

ultimate correctness of the trial court's admission of the evidence under any theory supported by the record, so long as both parties had a fair opportunity to develop the record and the circumstances otherwise would make it fair to do so.[67]

In *United States v. Rosenstein*,[68] the court accordingly affirmed the admission of evidence under the coconspirator exclusion to the hearsay rule, even though the evidence was admitted at trial under the business records exception. The court rejected the opponent's argument that admission of the evidence could not be affirmed on appeal under the coconspirator exclusion because the trial court failed to make at trial the requisite foundational findings that the statements were in furtherance of a conspiracy. The court said that it would make a post hoc determination on appeal of whether the record supported the exclusion.[69] It found that doing so did not in any way impinge upon any jury function.[70] The court explained that no unfairness results under circumstances where the evidence is deemed on appeal admissible for the truth of the matter asserted, because no different or other limiting instruction would have been necessary to explain to a jury its limited purpose.[71]

We conclude that the record supports the admissibility of the text messages in light of the hearsay rule and that it is fair to affirm the admission of the text messages under theories that neither the State nor the court articulated below—in large part due to the vagueness of Henry's objection. Specifically, for the reasons that follow, we conclude that the text messages by Henry are admissions by a party opponent and that the text messages from Critser are statements of a coconspirator. As

---

[67] See, *U.S. v. Paulino*, 13 F.3d 20 (1st Cir. 1994); *U.S. v. Williams*, 837 F.2d 1009 (11th Cir. 1988); *United States v. Rosenstein*, 474 F.2d 705 (2d Cir. 1973); *State v. Draganescu*, 276 Neb. 448, 755 N.W.2d 57 (2008).

[68] *United States v. Rosenstein, supra* note 67.

[69] *Id.*

[70] *Id.* Compare *Shepard v. United States, supra* note 66.

[71] See *United States v. Rosenstein, supra* note 67.

for the remaining text messages between Benson and Critser, if inadmissible hearsay, we conclude the admission of those text messages was harmless.

### (i) Henry's Statements

The State argues that the text messages sent by Henry were admissible under § 27-801(4)(b)(i), because they are statements of a party opponent. We agree. These text messages were "offered against" Henry and contained "his own statement[s]."[72] As such, under § 27-801(4)(b)(i), they were not hearsay.

### (ii) Critser's Statements to Henry

We conclude that Critser's statements to Henry were admissible as nonhearsay under the coconspirator exclusion to the hearsay rule. The coconspirator exclusion, found in § 27-801, provides: "(4) A statement is not hearsay if . . . (b) [t]he statement is offered against a party and is . . . (v) a statement by a coconspirator of a party during the course and in furtherance of the conspiracy." The coconspirator exclusion is another kind of "admissions" nonhearsay, attributable to the principal as an agent.[73] Under § 27-801(4)(b)(v), statements offered against a party that are made by a coconspirator of the party during the course of and in furtherance of the conspiracy are not hearsay and are admissible.

[26] The rule that a statement by a coconspirator is not hearsay if made during the course and in furtherance of a conspiracy is construed broadly in favor of admissibility.[74] The principal element of a conspiracy is an agreement or understanding between two or more persons to inflict a wrong against or injury upon another, but it also "requires an 'overt act.'"[75]

---

[72] See § 27-801(4)(b)(i).

[73] See David F. Binder, Hearsay Handbook, 4th § 35:9 (2015-16 ed.).

[74] *U.S. v. McMurray*, 34 F.3d 1405 (8th Cir. 1994).

[75] *State v. Hansen*, 252 Neb. 489, 500, 562 N.W.2d 840, 849 (1997).

[27,28] A conspiracy is ongoing until the central purposes of the conspiracy have either failed or been achieved.[76] There is no talismanic formula for ascertaining when a coconspirator's statements are in furtherance of the conspiracy; a statement need not be necessary or even important to the conspiracy, as long as it can be said to advance the goals of the conspiracy as opposed to thwarting its purpose.[77] But if the statements are merely idle chatter, took place after the conspiracy ended, or are merely narrative of past events, they are not admissible.[78]

Ideally, the trial court would make a finding that there was a conspiracy and that the statements admitted under the coconspirator exclusion were in the course and in furtherance of the conspiracy.[79] Obviously, that foundational finding was not made here, because the court did not articulate this theory of admissibility in overruling Henry's generalized hearsay objection. Nevertheless, we note that in a slightly different context, when Henry objected on hearsay grounds to Critser's testimony about what Henderson said at Jorgensen's house, the court found that the coconspirator exclusion to the hearsay rule set forth in § 27-801(4)(b) applied. Henry even seemed to concede at that time the existence of a conspiracy to rob Tony; he merely contested whether there was a conspiracy to rob or murder Jorgensen.

---

[76] See *id*. See, also, e.g., *Krulewitch v. United States*, 336 U.S. 440, 69 S. Ct. 716, 93 L. Ed. 790 (1949).

[77] See, e.g., *U.S. v. Martinez-Medina*, 279 F.3d 105 (1st Cir. 2002); *U.S. v. LiCausi*, 167 F.3d 36 (1st Cir. 1999).

[78] See, *State v. Gutierrez, supra* note 59; *State v. Bobo*, 198 Neb. 551, 253 N.W.2d 857 (1977).

[79] See, *U.S. v. Wright*, 932 F.2d 868 (10th Cir. 1991), *overruled on other grounds, U.S. v. Flowers*, 464 F.3d 1127 (10th Cir. 2006); *United States v. Marbury*, 732 F.2d 390 (5th Cir. 1984); *State v. Alvarez*, 820 N.W.2d 601 (Minn. App. 2012). See, also, *Bourjaily v. United States*, 483 U.S. 171, 107 S. Ct. 2775, 97 L. Ed. 2d 144 (1987).

In any event, the testimony of Critser, Henderson, and Benson sufficiently established that Critser, Henderson, and Henry were conspiring to rob Tony. Although much of this foundational testimony was adduced after exhibits 84 and 86 were entered into evidence, a correct evidentiary ruling will not be reversed simply because the foundational proof came at the wrong time.[80] And there is no bright-line requirement that the independent evidence of a conspiracy must precede the admission of coconspirator statements.[81]

### a. May 15 and 16

The text messages sent on May 15 and 16, 2013, were part of the text message conversation during which Critser and Henry first conceived of their plan to commit a robbery. By the fifth text message of this conversation, Henry had proposed that Critser come to Columbus to help Henry commit a robbery, and by the sixth, Critser had agreed. Over the remaining text messages in the conversation, they made arrangements for Henry to pick up Critser and discussed finding a gun. These text messages were clearly sent during the course and in furtherance of the conspiracy.

### b. May 19 to 25

The text messages written by Critser between May 19 and 25, 2013, were part of an ongoing conversation with Henry about covering up their involvement in Jorgensen's murder.

---

[80] See, *U.S. v. Williams, supra* note 67; *State v. Alvarez, supra* note 79.

[81] See, *State v. Gutierrez, supra* note 59; *State v. Copple*, 224 Neb. 672, 401 N.W.2d 141 (1987), *abrogated on other grounds, State v. Reynolds*, 235 Neb. 662, 457 N.W.2d 405 (1990); *State v. Conn*, 12 Neb. App. 635, 685 N.W.2d 357 (2004). See, also, e.g., *United States v. Fleishman*, 684 F.2d 1329 (9th Cir. 1982); *United States v. Clark*, 649 F.2d 534 (7th Cir. 1981); *United States v. Vargas-Rios*, 607 F.2d 831 (9th Cir. 1979); *United States v. Nelson*, 603 F.2d 42 (8th Cir. 1979); *State v. Thompson*, 273 Minn. 1, 139 N.W.2d 490 (1966); 6 Michael H. Graham, Handbook of Federal Evidence § 801:25 (7th ed. 2012 & Supp. 2016).

In these messages, Critser discussed (1) the proceeds from the murder; (2) disposing of Jorgensen's keys and the clothes they had worn during the murder; (3) getting rid of any fingerprints at the scene of the murder, either by breaking into Jorgensen's house or by burning it down; (4) being scared of getting caught; (5) looking for a gun; and (6) meeting up with Henry. These were also in the course and in furtherance of the conspiracy to rob Tony.

[29] The definitional exclusion to the hearsay rule applies to the coverup or concealment of the conspiracy that occurs while the conspiracy is ongoing, just as it would to any other part of the conspiracy.[82] Also, "[a] conspiracy to obtain money illegally does not end until the money is obtained or the conspirators have stopped trying to obtain it."[83]

The conspiracy to rob Tony was still ongoing at the time Henry sent the text messages between May 19 and 25, 2013. The central purpose of the conspiracy to rob Tony had not been achieved. Neither had the conspiracy been abandoned or defeated at the time of the statements concerning concealment of evidence linked to Jorgensen's murder. To the contrary, after Jorgensen's murder, Henry continued to pursue and eventually obtain a gun with which to rob Tony, and he continued to try to make arrangements to get Critser to return to Columbus.

[30] The statements between May 19 and 25, 2013, relating directly to the concealment of Jorgensen's murder, were in furtherance of this ongoing conspiracy to rob Tony. Whether it was the conspirators' original plan to murder Jorgensen, Jorgensen was murdered during the conspirators' attempt to get money from Jorgensen in order to buy a gun with which to rob Tony. And covering up the murder of Jorgensen was in furtherance of the ongoing conspiracy to rob Tony, because,

---

[82] Fenner, *supra* note 63, p. 102.

[83] Binder, *supra* note 73, § 35:13 at 996.

if the conspirators were caught for the murder of Jorgensen, then they would not be able to rob Tony.[84] When a conspiracy involves a sequence of objectives, concealment is usually an integral part thereof.[85]

[31,32] While a conspirator's statements during an ongoing conspiracy will not be in furtherance of the conspiracy if made after the conspirator's withdrawal from the conspiracy, Critser did not withdraw from the conspiracy before making the statements between May 19 and 25, 2013.[86] Upon proof of participation in a conspiracy, a conspirator's continuing participation is presumed unless the conspirator demonstrates affirmative withdrawal from the conspiracy.[87] And to withdraw from a conspiracy such that statements of a coconspirator are inadmissible, the coconspirator must do more than ceasing, however definitively, to participate.[88] Rather, the coconspirator must make an affirmative action either by making a clean breast to the authorities or by communicating abandonment in a manner calculated to reach coconspirators, and must not resume participation in the conspiracy.[89]

Although Critser indicated at trial that he had no real intention of returning to Columbus to carry out the robbery of Tony, he did not affirmatively communicate his abandonment of the conspiracy to Henry or Henderson. To the contrary, Critser

---

[84] See, e.g., *U.S. v. DiDomenico*, 78 F.3d 294 (7th Cir. 1996); *United States v. Pecora*, 798 F.2d 614 (3d Cir. 1986); *United States v. Del Valle*, 587 F.2d 699 (5th Cir. 1979); *Neal v. State*, 104 Neb. 56, 175 N.W. 669 (1919); *People v. Manson*, 61 Cal. App. 3d 102, 132 Cal. Rptr. 265 (1976).

[85] See *United States v. Del Valle, supra* note 84.

[86] See, e.g., *U.S. v. Zizzo*, 120 F.3d 1338 (7th Cir. 1997).

[87] *U.S. v. Patel*, 879 F.2d 292 (7th Cir. 1989); *United States v. Gibbs*, 739 F.2d 838 (3d Cir. 1984); *United States v. Basey*, 613 F.2d 198 (9th Cir. 1979); 29A Am. Jur. 2d *Evidence* § 853 (2008).

[88] See, *U.S. v. Robinson*, 390 F.3d 853 (6th Cir. 2004); *U.S. v. Zarnes*, 33 F.3d 1454 (7th Cir. 1994); *U.S. v. Patel, supra* note 87.

[89] *U.S. v. Hubbard*, 22 F.3d 1410 (7th Cir. 1994); *U.S. v. Patel, supra* note 87.

complained of not having received any money, indicated his willingness to try to obtain a gun with which to rob Tony, and indicated he would return to Columbus to carry out the robbery of Tony.

The text messages sent by Critser between May 19 and 25, 2013, were made during the course of and in furtherance of the conspiracy.

### (iii) Statements Between Benson and Critser

Because Benson was not part of the conspiracy to rob Tony, the messages between Benson and Critser do not fall under the exclusion found in § 27-801(4)(b)(v).[90] No other exclusion or exception would appear to apply to these statements to make them admissible for the truth of the matters asserted. But we find their admission harmless.

[33] Harmless error exists when there is some incorrect conduct by the trial court which, on review of the entire record, did not materially influence the jury in reaching a verdict adverse to a substantial right of the defendant.[91] Harmless error review looks to the basis on which the trier of fact actually rested its verdict; the inquiry is not whether in a trial that occurred without the error a guilty verdict would surely have been rendered, but, rather, whether the actual guilty verdict rendered was surely unattributable to the error.[92] Erroneous admission of evidence is harmless error and does not require reversal if the evidence is cumulative and other relevant evidence, properly admitted, supports the finding by the trier of fact.[93]

The majority of the text messages sent between Critser and Benson concerned the argument they had before Critser left for Columbus. Benson and Critser had a text message conversation during which she stated, "I am pissed that you're leaving

---

[90] See Fenner, *supra* note 63, p. 97.

[91] *State v. Lavalleur*, 289 Neb. 102, 853 N.W.2d 203 (2014).

[92] *Id.*

[93] *State v. DeJong*, 287 Neb. 864, 845 N.W.2d 858 (2014).

to go to commit crimes" and "your friend needs to learn some damn respect. This isn't his apartment to leave his trash around. That really pissed me off."

We find the admission of these text messages harmless, because they were cumulative not only to the text messages properly admitted but also to Benson's and Critser's testimony. Benson testified without objection (1) that she was "kind of upset" about Critser's letting Henry into her apartment and (2) that when Critser left on May 16, 2013, she believed he was going "[t]o go rob people for money and drugs." Critser similarly testified about the argument he had with Benson.

The remaining text messages entered into evidence contained statements about matters completely unrelated to this case, such as Benson's daughter's birthday and Benson's purchases at a discount store. These messages concerning matters unrelated to the case could not have materially influenced the jury in reaching its verdict.

### (c) Rule of Completeness

[34] Finally, Henry asserts that exhibits 84 and 86 were inadmissible under the rule of completeness.[94] Henry's objection that the exhibits were inadmissible under the rule of completeness, to the extent it was timely made below, has no merit. The "'rule of completeness'" states that an opponent may require one introducing part of a writing or statement to introduce any part which ought in fairness to be considered with the part introduced.[95] We find no merit to any contention that the relevant text messages lacked proper context or were somehow incomplete without text messages sent to and from persons unrelated to the case and pertaining to unrelated matters simply because all the messages were extracted during the same forensic examination of the cell phones and placed in the same documents prepared by the examiners.

---

[94] *Id.*

[95] *State v. Manchester*, 213 Neb. 670, 679, 331 N.W.2d 776, 782 (1983).

7. Assignment of Error No. 7

Henry next assigns that the district court erred in allowing exhibits 84 and 86 to go to the jury room. His argument on this assignment of error encompasses exhibit 84 but not exhibit 86. As such, our review necessarily will be limited to exhibit 84.[96]

This court has previously noted that, generally, a trial court does not have discretion to submit testimony materials to the jury for unsupervised review, but that the trial court has broad discretion to submit to the jury nontestimonial exhibits, in particular, those constituting substantive evidence of the defendant's guilt.[97]

Within this context, we have concluded that testimony materials include "live testimony at trial by oral examination or by some substitute for live testimony, including but not limited to, affidavit, deposition, or video recording of an examination conducted prior to the time of trial for use at trial."[98] Conversely, we have found that transcripts of online conversations "were not testimonial material but instead were substantive evidence of [the defendant's] guilt," because the transcripts proved that the defendant had used a computer to communicate with a person he believed to be under 16 years of age and that he had offered to engage in sexual activity with that person, both of which were elements of the crime charged.[99]

Similar to the transcripts of online conversations, exhibit 84 was a nontestimonial exhibit that contained substantive evidence of Henry's guilt. The exhibit was not prepared or offered as live testimony or as a substitute for live testimony. Nor was it transformed into a form of testimonial evidence by the fact that the State used the exhibit during its direct examination of Critser. Wholly apart from the testimony adduced at trial, the

---

[96] See *State v. Cook, supra* note 51.

[97] *State v. Castaneda, supra* note 8.

[98] *State v. Vandever*, 287 Neb. 807, 816-17, 844 N.W.2d 783, 790 (2014).

[99] *State v. Pischel*, 277 Neb. 412, 427-28, 762 N.W.2d 595, 607 (2009).

text messages in exhibit 84 were proof that Henry agreed with another person (Critser) to engage in robbery in Columbus. Exhibit 84 thus constituted substantive evidence of one of the crimes charged.

Because exhibit 84 was a nontestimonial exhibit that contained substantive evidence of Henry's guilt, the district court had broad discretion to submit it to the jury for use during deliberations.[100] We conclude that the court did not abuse its discretion by doing so, and we reject this assignment of error.

### 8. ASSIGNMENTS OF ERROR NOS. 8 AND 9

We address Henry's final two assignments of error together, because they both relate to the State's questioning of Critser regarding exhibit 84. During this questioning, the State referred to the cell phone with the 402-367-8802 number as being Henry's cell phone and the text messages sent from that number as being from Henry. Moreover, much of the direct examination of Critser consisted of the State's either asking Critser to read text messages from the exhibit and explain what he understood them to mean or restating the content of text messages within questions.

Henry argues that the district court erred in allowing the State to ask questions which "contained the assumption that the message was from . . . Henry and not simply from a number."[101] The manner in which a witness may be examined is within the sound discretion of the court.[102] We do not find that the district court abused its discretion in permitting the State to refer to the text messages as being from Henry. As discussed, the State's evidence supported the inference that Henry was the person sending the text messages. Additionally, Henry had the opportunity to thoroughly cross-examine Critser and the State's other witnesses on the topic of who used the

---

[100] See *State v. Castaneda, supra* note 8.

[101] Brief for appellant at 55.

[102] *Ederer v. Van Sant, supra* note 9.

cell phone found at the post office and whether the messages received on Benson's cell phone could falsely identify the sending number. Through such questioning, Henry reiterated that the State and its witnesses were only assuming, and could not be sure, that Henry sent the text messages.

[35] Henry also assigned that the district court erred in allowing the State to ask Critser what he understood the text messages to mean. However, Henry does not argue this assignment of error in his brief. An alleged error must be both specifically assigned and specifically argued in the brief of the party asserting the error to be considered by an appellate court.[103]

Even if Henry had preserved this issue for appeal by arguing it in his brief, we would not find that the district court abused its discretion in allowing the State to ask Critser what he understood the text messages to mean. The State established that Critser was qualified to give such testimony through its evidence (1) that Critser had "known [Henry] for quite a while" and was familiar with "how he talks" and (2) that Critser was familiar with the terminology of "the criminal world" from his time in prison. Moreover, Critser's explanation of the text messages was undoubtedly both relevant and helpful to the jury, given that the text messages contained numerous abbreviations and terms that may not have been familiar to the average person. We also note that Henry was allowed to thoroughly cross-examine Critser on the content of the text messages. For these reasons, we find no abuse of discretion in allowing the State to ask Critser about the meaning of the text messages.

## VI. CONCLUSION

Finding no merit to Henry's assignments of error, we affirm the judgment below.

AFFIRMED.

---

[103] *State v. Cook, supra* note 51.