IN THE NEBRASKA COURT OF APPEALS

## MEMORANDUM OPINION AND JUDGMENT ON APPEAL
### (Memorandum Web Opinion)

STATE V. JAMES

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

JA'MARIO JAMES, APPELLANT.

Filed February 27, 2018.    No. A-17-462.

Appeal from the District Court for Douglas County: SHELLY R. STRATMAN, Judge. Affirmed.

Stuart J. Dornan and Jason E. Troia, of Dornan, Troia, Howard, Breitkreutz & Conway, P.C., L.L.O., for appellant.

Douglas J. Peterson, Attorney General, and Joe Meyer for appellee.

PIRTLE, BISHOP, and ARTERBURN, Judges.

ARTERBURN, Judge.

## I. INTRODUCTION

After a bench trial, Ja'mario James was convicted of strangulation and terroristic threats. He was also found to be a habitual criminal pursuant to Neb. Rev. Stat. § 29-2221 (Reissue 2016). James was subsequently sentenced to a total of 10 to 12 years' imprisonment. He appeals from his convictions here. On appeal, James asserts that the district court erred in finding that he validly waived his right to a jury trial, in receiving into evidence copies of text messages, and in finding sufficient evidence to convict him of strangulation and terroristic threats. In addition, James asserts that he received ineffective assistance of trial counsel. Upon our review, we affirm James' convictions.

- 1 -

## II. BACKGROUND

The State filed an amended information charging James with count 1: strangulation, in violation of Neb. Rev. Stat. § 28-310.01 (Reissue 2016), a Class IIIA felony; count 2: terroristic threats, in violation of Neb. Rev. Stat. § 28-311.01 (Reissue 2016), a Class IIIA felony; and count 3: being a habitual criminal, pursuant to § 29-2221. The first two charges against James stem from an incident between James and his then girlfriend, M.C., which occurred on January 3 and into January 4, 2016.

On January 3, 2016, James was living with M.C. in her home in Omaha, Nebraska. The two had been involved in a romantic relationship intermittently since 2003. Most recently, they had started dating again in April 2015. However, M.C. testified that by January 2016, their relationship "wasn't that good" and had begun to deteriorate. In fact, M.C. testified that she had become fearful of James.

On January 3, 2016, James went with M.C. to Lincoln, Nebraska, so that she could visit her best friend and her god-daughter. The two stayed in Lincoln for most of the day until James decided he was ready to return to Omaha. M.C. testified that in the early evening hours of January 3, James told her that he was ready to leave and that if she wanted to stay in Lincoln any longer, she could find her own ride back to Omaha.

When they returned to M.C.'s house, they went into the master bedroom where James began playing a video game. James and M.C. began engaging in a verbal argument, and James ultimately took M.C.'s cellular telephone and went into the bathroom. He became upset about what he saw on her phone and, as a result, when he returned from the bathroom, he began "to be physical with her." M.C. testified that James spit on her, bit her cheek, slapped her, and punched her two or three times. She explained that when James hit her, he was holding a "cuticle cutter" in his hand. In addition, he "choked" her by standing behind her, putting her neck in the corner of his elbow, and applying pressure by "tightening" his elbow. M.C. testified that while James was choking her, her "air was getting cut short" and her ability to talk was hindered. When she told James that she could not breathe, he responded that he did not care whether she could breathe. M.C. testified that she feared for her life because she believed that James was going to kill her.

After approximately 45 minutes, the physical abuse stopped and James went back to playing his video game. M.C. remained in the bedroom with James and they continued to engage in a verbal argument.

After James had played his game for a time, M.C. testified that he resumed physically hurting her. He obtained a knife from the kitchen and told her he was going to cut her with the knife and make her go get stitches. M.C. testified that she pleaded with him not to hurt her. James used the knife to make a cut on the bed then threw the knife behind him. M.C. admitted that she could not completely remember what happened to the knife when James discarded it. James then retrieved a hammer and some petroleum jelly. He put the petroleum jelly on the wooden handle of the hammer and told M.C. to open her legs. M.C. testified that James used graphic language to indicate that he intended to sexually penetrate her with the hammer. M.C. testified that James told her that is what she wanted. She again pleaded with James not to hurt her. He then pulled her off

of the bed and onto the floor. James then kicked her repeatedly on her legs and her torso. At some point during the assault, James also twisted her arm "uncontrollably" until it was swollen.

M.C. admitted during cross-examination that she was not sure of the exact order of the abuse; however, she also indicated that she was sure that James had perpetrated each violent act on her during that night.

After a while, James again stopped physically abusing M.C. She indicated that she did not know why he decided to stop. She again remained in the bedroom with him because she believed her only "safe way out" of the house was to wait until the morning when she would normally leave for work. M.C. testified that although she did not remember the exact timing of the assaults, she knew that the abuse had lasted "[w]ell into the morning of [January] 4th" and she was supposed to leave for work at 7:45 a.m.

When M.C. left the house the next morning, James was still there. After arriving at her job as a dental hygienist, she immediately had to tend to her first patient. After finishing with that patient, she told her coworkers what had happened to her and showed them some of her injuries. Her office cleared her schedule for the week and she called her aunt, who lived in Kansas, to come pick her up. M.C. stayed in Kansas with her family for about a week. She testified that she decided to leave Omaha because she felt that her life had been threatened. When she returned, she reported the assault to law enforcement.

On January 12, 2016, M.C. met with Douglas County Sheriff's Deputy Joe Maguire. Deputy Maguire testified that during the interview, M.C. was "fearful at times" and "calm and matter of fact" when describing the assault. He also indicated that he observed cuts and bruises on her arms and bruising on her ankles. Photographs were taken of her injuries immediately after the interview. These photographs depict cuts, scrapes, and bruises on her arms, legs, left cheek, and left hip. After the interview, M.C. emailed Deputy Maguire some text messages exchanged between her and James after the assault. We will detail the substance of these text messages in our analysis below. However, we note that the messages reveal that the sender expressed remorse for being violent toward her and indicated that he did not know any better than to deal with his frustration through violence.

During his testimony, James provided a version of the events of January 3 and 4, 2016, which conflicted with M.C.'s version. James described his version of the events as follows: On January 3, James continued to take medication as a result of injuries he had suffered in a car accident in October 2015. When he and M.C. were in Lincoln on January 3, 2016, James told M.C. that he wanted to leave because his medication was making him "woozy." He and M.C. then returned to Omaha. When they got back to M.C.'s house, James received a telephone call from another of his "lady friends" who wanted him to come over for a while. James agreed. He told M.C. he was going to the store and went to the other woman's house for about 20-30 minutes. When James returned to M.C.'s house, his "lady friend" telephoned him again while he was sitting on the bed in the master bedroom clipping his nails with cuticle cutters. M.C. asked who he was talking to, and when he told her it was "none of her business," M.C. became upset.

James testified that M.C. hit him and grabbed his telephone. James then grabbed M.C. so that he could get his phone back. Specifically, James testified that he "twisted" the phone away from her and that he may have hit her with the cuticle cutters he was still holding in his hand.

Because James was upset with M.C., he told her that he was going to go through the contents of her telephone the next day. He also told her that if he found out she had lied to him about anything that they were "going to have some problems." James testified that he and M.C. continued to argue back and forth until he fell asleep between 9 and 10:30 p.m. due to the effects of his medication. He awoke the next morning when M.C. gave him a kiss and told him she was leaving for work.

James denied that he had choked, punched, bit, or strangled M.C. He also denied that he threatened her with either a knife or a hammer. Finally, he denied that he wrote the text messages she forwarded to Deputy Maguire. James also testified that it would have been impossible for him to stay awake until 3 o'clock in the morning on January 4th, due to the effects of his medication and due to him smoking "high grade" medical marijuana.

After hearing all of the evidence, the district court found James guilty of strangulation and terroristic threats. Subsequently, the district court found that James was a habitual criminal. The court sentenced James to 10 to 12 years' imprisonment for his conviction for strangulation and to 10 to 12 years' imprisonment for his conviction for terroristic threats. The court ordered the sentences to run concurrently with each other.

James appeals his convictions here.

## III. ASSIGNMENTS OF ERROR

On appeal, James assigns, renumbered, that the district court erred in (1) finding that he had validly waived his right to a jury trial; (2) receiving into evidence copies of text messages exchanged between James and M.C.; and (3) finding sufficient evidence to convict him of strangulation and terroristic threats. James also asserts that he received ineffective assistance of trial counsel in various respects.

## IV. ANALYSIS

### 1. WAIVER OF JURY TRIAL

### (a) Additional Background

On the day prior to trial, James appeared before the district court in order to waive his right to a jury trial and, instead, have his case tried to the court. Prior to the district court accepting James' waiver, the following discussion between James and the court occurred:

THE COURT: Let's do this. Mr. James, [defense counsel] has just indicated that you wish to waive your right to a jury trial and have your case tried to the bench. Is that what you want to do?

THE DEFENDANT: Yes, ma'am.

THE COURT: Okay. So, Mr. James, you understand that you have a right on the Amended Information that was filed back on August 29th to have all of these matters, the factual matters, decided by a jury. Do you understand that, sir?

THE DEFENDANT: Yes, ma'am.

THE COURT: And you understand that if you waive that right, then the facts and the law will both be decided by me? Do you understand that?

THE DEFENDANT: Yes, ma'am.

THE COURT: Is that what you want to do?

THE DEFENDANT: Yes, ma'am. I'd rather you have to do it. You know the law. The jury don't.

THE COURT: So you want to waive your right to a jury trial?

THE DEFENDANT: Yes, ma'am.

THE COURT: Are you doing so freely, knowingly, intelligently, and voluntarily?

THE DEFENDANT: Yes, ma'am.

THE COURT: And you've had enough time to discuss with [your counsel] the differences between if you had a jury trial and if you had a bench trial?

THE DEFENDANT: Well, I haven't seen [my counsel] too much over the course of this year I've been incarcerated, but I do my homework anyway, so - because I'm the one facing the consequences, [judge]. He's not. So basically he has the overloaded work schedule by being in the public defender [sic] office, so I did all my homework, all of my study by myself. I already knew - by me being incarcerated for a third of my life, I understood the repercussions and what goes on within the system and I understand the law.

THE COURT: Okay.

THE DEFENDANT: So I understand what can be done and what can't be done, and I understand that by having a jury circumstantial evidence will be used and even if you were to strike it, you can't take it out of the jury's mind. You can't take it out of the jury's mind. So I don't want preponderance of the evidence to be even included in my case. I want my case to be tried on the factual, purity, physical evidence basis. The only way that I can have my case tried on a physical, factual, evidence basis, prima facie, burden of proof, proof of claim, any of those things that fall up under, I must depend on you to make sure that my constitutional rights are protected and not violated.

THE COURT: Okay. And I just have a couple more questions I need to make sure of. Has anybody promised you anything in order to get you to waive your right to a jury trial?

THE DEFENDANT: No, ma'am.

THE COURT: Anybody threatened you in any way in order to get you to waive your right?

THE DEFENDANT: No, ma'am.

THE COURT: So you're doing so freely, knowingly, intelligently, and voluntarily?

THE DEFENDANT: Most definitely doing it intelligently, voluntarily, illuminated (sic), however you want to say it, [judge].

THE COURT: Okay. Then I'll show that Mr. James has waived his right to a jury trial and it'll be tried to the bench.

On appeal, James asserts that the district court erred in accepting his waiver of his right to a jury trial because his waiver was "defective." Brief for appellant at 14. Specifically, James argues that his discussion with the district court reveals that he did not, in fact, understand his right to a jury trial. He did not understand "the jury's role as a fact finder." *Id*. at 15. Based upon our review

of the discussion between James and the district court, we do not find that the court erred in accepting James' waiver of his right to a jury trial. His assertion has no merit.

### (b) Analysis

The right to trial by jury is personal and may be waived by a criminal defendant. *State v. Perez-Cruz*, 23 Neb. App. 743, 874 N.W.2d 905 (2016). In order to waive the right to trial by jury, a defendant must be advised of the right to jury trial, must personally waive that right, and must do so either in writing or in open court for the record. *Id*. The waiver of a right to jury trial must be express and intelligent and cannot be presumed from a silent record. *Id*.

Here, the district court explicitly informed James that he had a right to have all of the "factual matters" decided by a jury and that if he waived that right, both the law and the facts would be decided by the court. James acknowledged his understanding of the effect of waiving his right to trial by jury. The district court then asked James whether his decision to waive his right to a trial by jury was knowing, intelligent, and voluntary. James twice responded affirmatively to this question. In fact, when asked the second time whether his decision to waive his right to a trial by jury was knowing, intelligent, and voluntary, James responded, "Most definitely[.]"

Based upon the colloquy between James and the district court, it is clear that James was properly advised of his right to a trial by jury, that he was adequately informed that if he waived this right the court would be deciding both issues of fact and of law, and that, understanding the consequences, he validly waived his right to a trial by jury. However, despite the precise advisement of his right to a trial by jury, James now asserts that he did not, in fact, understand the consequences of his waiver. James argues that his discussion with the district court demonstrates that he does not have a grasp of basic legal concepts, including the jury's role as a fact finder during a jury trial. We do not agree with James' assertion.

First, we note that a review of the entirety of the record reveals that James has significant prior experience with the legal system and that he is capable of articulating his own legal arguments. As he told the district court, he has been incarcerated for a third of his life, and, as a result, he has clearly gleaned information about the criminal justice system. As such, while some of James' comments to the district court evidence his confusion with some legal terms, there is nothing to indicate that James did not understand the district court's careful and thorough explanation of his right to a trial by jury. The district court was very careful to explain James' right and the consequences of waiving that right. He acknowledged his understanding of those concepts and was adamant that he wished to waive his right to a trial by jury. He did not ask the court any questions about his right, nor did he ask for more time to speak with his trial counsel. Given that James clearly understood his right to a trial by jury, his waiver of that right was valid. James' assertion to the contrary is without merit.

### 2. Admission of Text Messages Into Evidence

#### (a) Additional Background

During M.C.'s testimony, she discussed text messages that she said she exchanged with James in the days after the assault. She testified that the text messages came from the telephone number she associated with James. In addition, she testified that contained within the messages

was information only she and James would know, including a discussion of the events of January 3 and 4, 2016. The State offered copies of the text messages into evidence. The copies of the messages do not include telephone numbers or dates, but do include conversation bubbles which reflect a back and forth conversation between two people. Each bubble is designated with a specific time. M.C. explained that she had simply taken "screen shots" of the text message conversation between her and James. She also testified the copies of the text messages are "a true and accurate reflection of the text messages that were on [her] phone." James objected "foundationally" to the admission of the text messages into evidence. He argued that anyone could have just typed up the messages. The court accepted the text messages into evidence, explaining, "It's going to go to weight more than anything."

The content of the text messages received into evidence indicate that the person texting M.C. told her, "I never meant to b [sic] violent to u [sic] I promise you never have to fear me." The person also stated, "[T]he only way I know how to deal with frustration is violence." When M.C. sent a message which stated, "You took it to the point where I felt soooo [sic] uncomfortable that I had [to] leave," the person texting with her replied, "True I went to [sic] far." After M.C. sent a picture of what appears to be her injured arm, the person replied "I'm truly sorry . . . [f]or hurting you."

(b) Standard of Review

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016).

(c) Analysis

On appeal, James asserts that the district court erred in admitting the text messages into evidence because "insufficient foundation was offered for the exhibits." Brief for appellant at 21. He argues that there "was not any identifying information [in the text messages] to establish the source or date[,]" nor was there "corresponding cell phone records documenting that a phone used by James was communicating with a phone used by [M.C.]" *Id*. Upon our review, we conclude that the district court properly admitted the text messages into evidence.

Generally, the foundation for the admissibility of text messages has two components: (1) whether the text messages were accurately transcribed and (2) who actually sent the text messages. *State v. Henry, supra*. In this case, M.C. testified that the copies of the text messages admitted into evidence accurately reflected the content of the text messages which appeared on her telephone. In fact, she testified that the copies of the text messages admitted into evidence were "screen shots" of the text messages from her telephone. She did not have to transcribe the messages at all. In addition, M.C. testified that, although the telephone number of the sender did not appear on the copies of the text messages, that she received the messages from a telephone number that she associated with James. In addition, she testified that the content of the messages indicated that

James was the sender because there was information included within the messages that only James would know.

Based on the totality of M.C.'s testimony, we find sufficient foundation for the admission of the text messages into evidence. M.C. established that the messages were accurately transcribed and she provided testimony to prove that James had sent the messages. However, we acknowledge that during his testimony, James denied sending the text messages. We note that the proponent of the text messages is not required to conclusively prove who authored the messages before they can be admitted into evidence. *State v. Henry, supra*. Instead, the possibility of an alteration or misuse by another generally goes to weight, not admissibility. *Id*. The district court correctly noted this fact when it overruled James' foundational objection to the messages. The district court did not abuse its discretion in admitting the messages into evidence.

### 3. SUFFICIENCY OF EVIDENCE

#### (a) Standard of Review

Regardless of whether the evidence is direct, circumstantial, or a combination thereof, and regardless of whether the issue is labeled as a failure to direct a verdict, insufficiency of the evidence, or failure to prove a prima facie case, the standard is the same: In reviewing a criminal conviction, an appellate court does not resolve conflicts in the evidence, pass on the credibility of witnesses, or reweigh the evidence; such matters are for the finder of fact, and a conviction will be affirmed, in the absence of prejudicial error, if the evidence admitted at trial, viewed and construed most favorably to the State, is sufficient to support the conviction. *State v. Jedlicka*, 297 Neb. 276, 900 N.W.2d 454 (2017).

#### (b) Analysis

James' assertion about the sufficiency of the evidence to support his convictions focuses only on his convictions for strangulation and terroristic threats. He does not argue that there was insufficient evidence to support his conviction for being a habitual criminal.

James was charged with and convicted of two offenses as a result of the incident in January 2016: strangulation, pursuant to § 28-310.01, and terroristic threats, pursuant to § 28-311.01. We detail the elements of each offense, as charged by the State and delineated in the relevant statute. Section 28-310.01 provides: "A person commits the offense of strangulation if the person knowingly or intentionally impedes the normal breathing or circulation of the blood of another person by applying pressure on the throat or neck of the other person." Section 28-311.01 provides in pertinent part: "A person commits terroristic threats if he or she threatens to commit any crime of violence [w]ith the intent to terrorize another."

On appeal, James does not specifically challenge either of the convictions, nor does he assert that the State failed to prove any particular element of the charged offenses. Rather, he asserts that the court should not have convicted him of either of the charged offenses because "[M.C.'s] word was insufficient in light of the contradictory evidence, lack of physical evidence, and incomplete evidence offered." Brief for appellant at 20. In support of James' assertion, he reiterates, in detail, his own testimony about his version of the events of January 3 and 4, 2016. Essentially, James' entire argument focuses on witness credibility.

If believed by the district court, the evidence presented by the State, including, M.C.'s testimony, pictures of her injuries, and the copies of the text messages between M.C. and James, could establish the necessary elements for each of James' convictions. M.C. testified that on the night of January 3, 2016, and into the early morning hours of January 4, James "choked" her by standing behind her, putting her neck in the corner of his elbow, and applying pressure by "tightening" his elbow. She testified that while James was choking her, her "air was getting cut short" and her ability to talk was hindered. When she told James that she couldn't breathe, he responded that he did not care whether she could breathe. She testified that she feared for her life because she believed that James was going to kill her. She also testified that James threatened to cut her with a knife so that she would need stitches and threatened to sexually penetrate her with the wooden handle of a hammer. She begged James not to hurt her. She testified that she feared for her life as a result of James' actions.

Both the pictures of M.C.'s injuries and the text messages exchanged between her and James after the assault support her testimony about the assault. The pictures reveal that even one week after the incident, she had significant bruising throughout her body and had multiple healing cuts and scrapes. In the text messages, James admitted to being violent with her and apologized for his actions.

While, on appeal James asserts that M.C.'s testimony, in particular, was not credible, the district court, as the fact finder, clearly found her testimony to be credible. When reviewing a criminal conviction for sufficiency of the evidence, we, as an appellate court, do not pass on the credibility of witnesses. See *State v. France*, 279 Neb. 49, 776 N.W.2d 510 (2009). Because the district court as the trier of fact could have found all of the essential elements for strangulation and terroristic threats beyond a reasonable doubt based on the State's evidence, the evidence was sufficient to support James' convictions. James' assertion to the contrary has no merit.

4. INEFFECTIVE ASSISTANCE OF COUNSEL

(a) Standard of Review

Whether a claim of ineffective assistance of trial counsel can be determined on direct appeal presents a question of law, which turns upon the sufficiency of the record to address the claim without an evidentiary hearing or whether the claim rests solely on the interpretation of a statute or constitutional requirement. See *State v. Castillo-Zamora*, 289 Neb. 382, 855 N.W.2d 14 (2014). We determine as a matter of law whether the record conclusively shows that (1) a defense counsel's performance was deficient or (2) a defendant was or was not prejudiced by a defense counsel's alleged deficient performance. See *id*.

(b) Analysis

On appeal, James alleges that his trial counsel was ineffective in three different respects: failing to obtain and offer into evidence medical records related to a car accident James was involved in prior to the incident in January 2016; failing to call a particular witness who would have testified about M.C.'s jealousy and motive to lie; and failing to ensure that the recording of M.C.'s interview with police was preserved until trial. We will address each of James' allegations

of ineffective assistance of counsel below. First, however, we detail the relevant law which overlays our analysis of ineffective assistance of counsel claims which are made on direct appeal.

James is represented in this direct appeal by different counsel than the counsel who represented him at the trial level. When a defendant's trial counsel is different from his or her counsel on direct appeal, the defendant must raise on direct appeal any issue of trial counsel's ineffective performance which is known to the defendant or is apparent from the record. Otherwise the issue will be procedurally barred. *State v. Casares*, 291 Neb. 150, 864 N.W.2d 667 (2015). The fact that an ineffective assistance of counsel claim is raised on direct appeal does not necessarily mean that it can be resolved. *State v. Mendez-Osorio*, 297 Neb. 520, 900 N.W.2d 776 (2017). The determining factor is whether the record is sufficient to adequately review the question. *Id*.

To prevail on a claim of ineffective assistance of counsel under *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the defendant must show that counsel's performance was deficient and that this deficient performance actually prejudiced his or her defense. *State v. Ortega*, 290 Neb. 172, 859 N.W.2d 305 (2015).

When a claim of ineffective assistance of trial counsel is raised in a direct appeal, the appellant is not required to allege prejudice; however, an appellant must make specific allegations of the conduct that he or she claims constitutes deficient performance by trial counsel. *State v. Casares, supra*. General allegations that trial counsel performed deficiently or that trial counsel was ineffective are insufficient to raise an ineffective assistance claim on direct appeal and thereby preserve the issue for later review. *Id*.

Appellate courts have generally reached ineffective assistance of counsel claims on direct appeal only in those instances where it was clear from the record that such claims were without merit or in the rare case where trial counsel's error was so egregious and resulted in such a high level of prejudice that no tactic or strategy could overcome the effect of the error, which effect was a fundamentally unfair trial. *Id*. An ineffective assistance of counsel claim made on direct appeal can be found to be without merit if the record establishes that trial counsel's performance was not deficient or that the appellant could not establish prejudice. *Id*. See, also, *State v. Filholm*, 287 Neb. 763, 848 N.W.2d 571 (2014).

We now address each of James' allegations of ineffective assistance of trial counsel.

### (i) Failure to Obtain Medical Records

James alleges that his trial counsel was ineffective in failing to obtain medical records relating to the injuries he suffered in the October 2015 car accident so that those records could have been offered into evidence at trial. James asserts that the medical records would have corroborated his version of the events of January 3 and 4, 2016. Specifically, the records would have demonstrated the medications he was taking in January and his resulting inability to physically harm M.C. as she described. The record refutes James' claim of ineffective assistance of counsel.

At the hearing the day before the scheduled trial, James informed the court that he wanted the court to consider his medical records as a part of his defense. James' trial counsel informed the court that he was asking for a continuance of the trial date because he did not have "a proper witness to lay foundation for medical records" available to appear the next day. The court then

explained to James that the medical records would not be admissible without a proper foundational witness. The court indicated to James that it could grant him a continuance in order for his counsel to secure a foundational witness. When James responded, "Don't worry about it . . . I guess it's not important," the court told him that it was "extremely" important because he was "facing a lot of time if the State is able to prove this case." James indicated that he understood what the court was saying, but, ultimately, he informed the court that he "would like to continue with the trial without . . . any medical records because they've got to prove beyond a reasonable doubt."

The record reveals that James insisted on going to trial, despite the cautionary advisement of the court and his trial counsel's explanation that a continuance would be necessary to secure a foundational witness for the medical records. The record reveals that James had a clear understanding that if there was no foundational witness available to testify regarding his medical records, that the medical records would not be admitted into evidence. James made a calculated decision to go to trial the next day knowing that the medical records would not be a part of his defense. As a result, he cannot now complain that his counsel was ineffective in failing to offer the medical records at trial. Counsel explained to both James and the court that a continuance of the trial would be necessary to secure a foundational witness for the medical records. James decided that it was more important to have the trial the next day than to have the medical records as evidence. His claim of ineffective assistance of counsel is without merit.

### (ii) Failure to Secure Witness Testimony

James alleges that his trial counsel was ineffective in failing to secure the testimony of a woman named Shalae Richardson. He asserts that Richardson would have testified about M.C.'s jealousy regarding James and about M.C.'s motive to lie about James' actions. He further asserts that such testimony would have "damaged" M.C.'s credibility and changed the result of the trial. Brief for appellant at 22. Our record on appeal is not sufficient to address James' claim because we do not know what, if any, steps trial counsel took to secure Richardson as a witness or why counsel may have decided not to call Richardson as a witness. In addition, we do not know whether, or when, James alerted trial counsel to the importance of calling Richardson as a witness.

### (iii) Failure to Obtain Recording of M.C.'s Interview

During the trial, Deputy Maguire testified that although his interview with M.C. was recorded, that the recording was not preserved and, as a result, was unavailable during the trial. James alleges that his trial counsel was ineffective in failing to ensure that the recording of M.C.'s interview was preserved for the trial. He argues that had the interview been preserved, counsel could have used the contents of the interview to impeach her trial testimony based on inconsistencies in her story. Our record on appeal is not sufficient to address James' claim because we do not know the exact circumstances surrounding the preservation of the recording. We also do not know what, if any, steps counsel took to preserve the recording of the interview or whether he was informed prior to trial that the recording had not been preserved.

## V. CONCLUSION

For the reasons set forth above, we affirm James' convictions for strangulation, terroristic threats, and being a habitual criminal. As to James' claim of ineffective assistance of trial counsel, we find that he was not denied effective assistance when his medical records were not admitted into evidence. We find that the record is insufficient to review the remaining grounds for James' ineffective assistance of counsel claim.

AFFIRMED.