IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

STATE V. FURMAN

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

STATE OF NEBRASKA, APPELLEE,

V.

TYLER L. FURMAN, APPELLEE.

Filed October 8, 2024.    No. A-23-787.

Appeal from the District Court for Lancaster County: RYAN S. POST, Judge. Affirmed.

Bell Island, of Island Law Office, P.C., L.L.O., for appellant.

Michael T. Hilgers, Attorney General, and Nathan A. Liss for appellee.

PIRTLE, Chief Judge, and ARTERBURN and WELCH, Judges.

PIRTLE, Chief Judge.

## I. INTRODUCTION

Tyler L. Furman was convicted in the county court for Lancaster County on one count of DUI–second offense. His conviction was affirmed on appeal to the district court. He now appeals the district court's affirmance of the county court's judgment related to the admission of his chemical breath test, the denial of his motion to suppress, and the overruling of an objection at trial. For the reasons that follow, we affirm.

## II. BACKGROUND

On July 21, 2021, at around 5:30 a.m., an off-duty University of Nebraska-Lincoln police officer, John Backer, noticed a vehicle sitting in the grass 10 to 12 feet away from the road as he was driving by to drop his son off at work. The vehicle was parked in a ditch with its headlights facing away from the road. On his way back from dropping off his son, the vehicle was still there so he called 9-1-1 and went to investigate. Upon approaching the vehicle, Backer saw that it was

still running, and had a single occupant who was sleeping in the driver's seat. When the occupant got out of the vehicle, Backer noticed that he appeared disheveled and smelled like alcohol.

Approximately 15 to 20 minutes later, deputies from the Lancaster County sheriff's office responded and took over the scene. The occupant, who later identified himself as Furman, told the deputies that he stopped there the previous night because he was tired and needed to sleep. The deputies reported that Furman smelled like alcohol and had bloodshot eyes. Furman told the deputies that he had consumed four alcoholic drinks at approximately 10:30 p.m. the prior night and had not consumed any since. The deputies proceeded to conduct several field sobriety tests to determine whether he was impaired. After Furman failed all three tests and a preliminary breath test indicated the presence of alcohol, the deputies determined that he was impaired and placed him under arrest for DUI. Furman was taken to the Lancaster County detox center for further testing where he was administered a formal breath test via a DataMaster machine. The result of this test showed that he had a blood alcohol content of .125 grams.

On August 19, 2021, Furman was charged in the county court with DUI–second offense. On March 15, 2022, he filed a motion to suppress all evidence collected as a result of his stop and arrest alleging that the officers did not have a warrant or probable cause. During the suppression hearing, Furman claimed that he tried to leave after the initial encounter with Backer but was told that he was not allowed to. Backer testified that he told Furman he was an off-duty officer, but denied telling him that he was not allowed to leave.

In the county court's order, it accepted Backer's testimony over Furman's and found that because the initial encounter was voluntary it did not trigger Fourth Amendment protections. It also found that the deputies had reasonable suspicion to conduct further tests due to Furman's behavior, his bloodshot and watery eyes, and his admission to drinking the night before. It then found that Furman failing all three field sobriety tests and a preliminary breath test gave the officers probable cause to arrest him. As a result, the court denied Furman's motion to suppress.

A jury trial was held from November 14 to November 16, 2022. Prior to the start of the trial, Furman raised the same objections to the evidence that he made in his motion to suppress. The court overruled these objections and allowed Furman to enter continuing objections to the evidence. During the trial, the State called five witnesses: Kayla Puhrmann, Backer, Deputy Brad Sturdy, Deputy Jason Schnieder, and Officer Kyle Hoggins. Furman called two witnesses: Dr. Robert John Belloto, Jr., and Anthony Palacios.

Puhrmann is an identification lab specialist for the Lincoln Police Department. In this role, she is responsible for the maintenance of the DataMaster instruments. In her testimony, she essentially explained how the DataMaster works, how it is maintained, and who is allowed to administer tests with it. She also discussed the rules and regulations for testing someone's alcohol level and maintaining the DataMaster machines. She testified that these rules and regulations are created by the Nebraska Department of Health and Humans Services (DHHS) and are called "Title 177." She also testified that the DataMaster used to test Furman was properly calibrated, maintained, and tested according to Title 177's requirements.

During Puhrmann's testimony, the State offered five exhibits into evidence in a single offering. One of these exhibits, exhibit 14, was an uncertified copy of Title 177. Furman's attorney objected to the admission of these five exhibits based on lack of foundation and hearsay. The court

overruled the objections as to exhibit 14 and one other exhibit but required further foundation for the remaining exhibits which were eventually received.

Backer then testified and stated that he worked for the University of Nebraska-Lincoln police department and has done so for around 20 years. He then recounted approaching Furman's vehicle after seeing it on the side of the road. Prior to contacting the vehicle, he called 9-1-1 and described the scene. In the 9-1-1 recording, Backer stated the car was running and that there was a man slumped over in the driver's seat. He told the 9-1-1 operator that he was going to open the door to make sure the occupant was okay and stated that he "won't let him drive off."

Backer testified that he stayed with Furman for approximately 15 to 20 minutes until the deputies arrived. He stated that during this time Furman looked slightly disheveled, groggy, and smelled like alcohol. However, he said that Furman did not have any problem getting out of the vehicle or maneuvering the uneven ground the car was parked on.

Sturdy, the first responding deputy, also testified. Sturdy has worked for the Lancaster County sheriff's office for approximately 14 years and has conducted around 100 DUI investigations in his career. He first explained his training in identifying whether drivers are impaired. He stated that signs of alcohol impairment include watery or bloodshot eyes, slurred speech, lack of balance, lack of fine motor skills, the odor of alcoholic beverages, and "horizontal gaze nystagmus," which is the inadvertent bouncing of the eyes when someone takes a depressant, like alcohol.

Sturdy testified that Furman smelled like alcohol and described the scene. He stated the vehicle was parked in a ditch with tire tracks in the grass leading in both directions. In front of the vehicle, there were marks that went up an embankment to some trees. And behind the vehicle there were tire marks in the grass that crossed the gravel road and went up a small incline on the opposite side. After asking Furman how the vehicle ended up in the ditch, Furman claimed to be a heavy sleeper and stated that he pulled over on his way home from work at around 11 p.m. or 12 a.m. the previous night. Furman then allowed Sturdy to search him for weapons and was placed in a secured patrol vehicle while Sturdy spoke with Backer about the incident. Upon Schnieder and Hoggins arriving, Sturdy transferred the investigation to them.

Schnieder then testified. He has worked for the Lancaster County sheriff's office for approximately eight years and has conducted over 300 DUI investigations throughout his career. On the day of the incident, he responded to the scene with a deputy he was training, Hoggins.

Upon arriving at the scene, Schnieder testified that Furman's eyes were red and bloodshot and that he smelled like alcohol. He also mentioned that Furman dropped his cellphone and "had difficulty maintaining his dexterity." While Furman was still in the police vehicle, he told Schnieder that he had been at a work event the previous night and had consumed two beers and two "sake bombs," which is a mixture of beer and sake, but had not consumed anything since. Furman also told him that he had been heading home the previous night, but pulled over because he was getting tired.

Schnieder eventually asked Furman to participate in standardized sobriety tests and he agreed to participate. As part of his testimony, Schnieder described the field sobriety tests law enforcement officers are trained to conduct when they believe a driver is impaired. He stated that there were three main maneuvers: the horizontal gaze nystagmus, the walk and turn, and the one leg stand. He explained that the horizontal gaze nystagmus tests the "inadvertent bouncing of the

eyes" that occurs when someone drinks alcohol or another depressant. When conducting this test, he stated that he is looking for "lack of smooth pursuit, distinct sustained nystagmus at maximum deviation, and onset of nystagmus prior to 45 degrees in each eye." Essentially, for this test, law enforcement is looking at whether the suspect's eyes are bouncing and ticking when moving back and forth, when looking at the furthest points of their vision, and prior to their eyes reaching a 45-degree angle.

Schnieder also explained the walk and turn maneuver and how it tests whether someone can maintain their attention while being given instructions. The test involves the suspect walking heel-to-toe on an imaginary line for nine steps, turning around, and repeating the maneuver while walking back to the starting position. While doing this, the person is instructed to look at their feet, keep their hands at their sides, and count each step. Schnieder then described the one leg stand test. The suspect is first instructed to stand with their feet together and hands at their side. They are then told to lift one of their feet 6 inches off the ground while counting by thousands until they are told to stop.

Once Furman agreed to participate in the field sobriety tests, Schnieder administered the three assessments. For the horizontal gaze nystagmus maneuver, Schnieder testified that Furman displayed six out of six indicators of impairment. He stated that Furman had a "lack of smooth pursuit" in both eyes, "distinct and sustained nystagmus at maximum deviation" in both eyes, and the onset of nystagmus prior to his eyes reaching 45 degrees. For the walk and turn maneuver, Furman demonstrated four out of eight indicators of impairment. He was unable to maintain the start position, stepped off the line, used his arms for balance, and missed two heel-to-toe steps. For the one leg stand test, Schnieder stated that Furman's results displayed one of four indicators of impairment but highlighted that he did not complete the test. He stated that Furman only lifted his foot 2 to 3 inches off the ground, did not look at his foot, used his arms for balance, stopped counting by thousands, and did not complete the maneuver.

Schnieder then testified that based on his training and experience, in conducting more than 500 field sobriety tests, that Furman's test results indicated that he was impaired. Because of this, Furman was placed under arrest to undergo further testing.

Hoggins also testified at trial. At the time of the incident, he was a deputy for the Lancaster County sheriff's office and is currently a police officer for the Wayne Police Department. When the incident occurred, he was still in training and Schnieder was his field training officer. Hoggins testified that after Furman was placed under arrest, he administered a formal breath test using a DataMaster. Prior to this, Hoggins had never used the machine, but had previously been trained in how to use it. He testified that he took all the necessary steps prior to conducting the test, that he made no mistakes in administering the test, and that Furman's result displayed that he had a blood alcohol content of .125 grams of alcohol per 210 liters of breath.

Furman then called his two witnesses to testify. Belloto generally explained problems associated with relying on DataMaster machines to test for alcohol impairment. He also discussed potential issues with Furman's test result. However, because Furman does not assign an error related to the reliability of the DataMaster test result, we will not include further details of this testimony.

Palacios then testified. He is a law enforcement consultant who specializes in the National Highway Traffic Safety Administration's impaired driving training curriculum that many law

enforcement officers must complete to administer field sobriety tests. His testimony generally consisted of instances from the recordings where he believed that Furman did not demonstrate impairment. He first noted that prior to the field sobriety tests Furman did not have any trouble walking around the scene. He also stated that in his opinion Furman did not display any slurred speech or difficulties in controlling his mental or physical faculties. He mentioned that Furman was able to quickly follow the deputies' instructions to get out of the patrol car without losing balance, retrieve his license from his wallet without difficulty, and walk on the grassy incline without stumbling.

Palacios also testified that Schnieder did not administer the horizontal gaze nystagmus test correctly. He stated that in relation to the appropriate time rate for the test, "every step [Schnieder] made was incorrect." For the equal tracking assessment, he said that because Schnieder conducted four passes, the test should have taken 16 seconds or 4 seconds for each pass. However, that portion of the test only took 8 seconds. Similarly, the smooth pursuit test should have also taken 16 seconds, but it was completed in 9 seconds. He also stated that for the sustained nystagmus at maximum deviation test, the maximum deviation position needs to be held for 4 seconds each time, but Schnieder only held it for 4 seconds on one of his four passes. Palacios said the other three passes were only held for 3 seconds. He also stated that the 45-degree angle test was done incorrectly. He explained that the training curriculum instructs officers to only move the stimulus back inside upon reaching 45 degrees when they have not seen onset nystagmus. But Schnieder moved the stimulus back inside each time while also claiming he saw onset nystagmus.

Palacios also questioned Schnieder's interpretation of Furman's one leg stand maneuver. He explained that the four criteria of impairment for this test are whether the suspect puts their foot down, uses their arms for balance, or sways or hops. After reviewing the recording, Palacios stated that he did not see any of these indicators present during Furman's test. He continued to state that while Furman displayed some indicators of impairment on the walk and turn test, the one leg stand assessment has been determined to be more reliable.

The matter was then sent to the jury and after deliberation, the jury returned a guilty verdict. The county court accepted the jury's verdict, fined him $500, sentenced him to 60 days' incarceration, and revoked his license for 18 months.

Furman perfected a timely appeal with the district court and raised five errors on appeal. Restated, he assigned the county court erred by (1) admitting his chemical test result because (a) the uncertified copy of Title 177 was hearsay and lacked sufficient foundation and (b) the State failed to prove the chemical test result was obtained in accordance with the methods approved by DHHS; (2) overruling his motion to suppress because (a) Furman was seized by an officer outside his primary jurisdiction, (b) there was not reasonable suspicion for Furman's seizure, (c) there was not reasonable suspicion to conduct field sobriety tests, and (d) there was no probable cause to arrest him; and (3) allowing Schnieder to give opinion testimony that a person who is not impaired will not have horizontal gaze nystagmus.

On August 8, 2023, the district court issued an order affirming the county court's judgment and sentence. The court found that Furman's objections to the copy of Title 177 were not preserved because the objections were made simultaneously to five different exhibits and did not specify the certification issues raised on appeal. However, the court also found that even if the objections were specific enough, the copy was self-authenticating under Neb. Rev. Stat. § 27-902(5) (Reissue

2016), as a publication issued by a public authority. The court also found the State showed the DataMaster result was obtained in compliance with the methods required by DHHS because Puhrmann testified that the copy of Title 177 was a fair and accurate copy of the DHHS rules that were then in effect for the operation of the DataMaster machines.

The court then held the motion to suppress was properly denied because Furman's initial interaction with Backer did not amount to a seizure and Schnieder had reasonable suspicion to conduct the field sobriety tests, the results of which gave him probable cause to arrest Furman. Lastly, the district court determined Schnieder's testimony about horizontal gaze nystagmus was properly admitted because he did not opine that the presence of nystagmus equated to impairment. But even if he did, the court found that the testimony did not exceed the limited purpose of establishing that Furman had an impairment that may have been caused by alcohol.

Furman now appeals the district court's affirmance of the county court's decision.

## III. ASSIGNMENTS OF ERROR

Restated and consolidated, Furman assigns the district court erred in affirming the county court's decisions (1) to admit his breath test results because the State did not produce a certified copy of Title 177; (2) to deny his motion to suppress because (a) Backer was operating outside of his primary jurisdiction, (b) the deputies lacked reasonable suspicion to place Furman in the patrol car, and (c) the deputies lacked reasonable suspicion to conduct field sobriety tests; and (3) to overrule the objection to Schnieder's testimony equating horizontal gaze nystagmus to driving while impaired.

## IV. STANDARD OF REVIEW

When deciding appeals from criminal convictions in county court, we apply the same standards of review that we apply to decide appeals from criminal convictions in district court. *State v. Montoya*, 305 Neb. 581, 941 N.W.2d 474 (2020).

In proceedings where the Nebraska Evidence Rules apply, the admissibility of evidence is controlled by the Nebraska Evidence Rules; judicial discretion is involved only when the rules make discretion a factor in determining admissibility. *State v. Anthony*, 316 Neb. 308, 4 N.W.3d 393 (2024). Where the Nebraska Evidence Rules commit the evidentiary question at issue to the discretion of the trial court, an appellate court reviews the admissibility of evidence for an abuse of discretion. *State v. Anthony, supra.*

In reviewing a trial court's ruling on a motion to suppress based on a claimed violation of the Fourth Amendment, an appellate court applies a two-part standard of review. *State v. Briggs*, 308 Neb. 84, 953 N.W.2d 41 (2021). Regarding historical facts, an appellate court reviews the trial court's findings for clear error, but whether those facts trigger or violate Fourth Amendment protections is a question of law that an appellate court reviews independently of the trial court's determination. *State v. Briggs, supra.* When a motion to suppress is denied pretrial and again during trial on renewed objection, an appellate court considers all the evidence, both from trial and from the hearings on the motion to suppress. *State v. Piper*, 289 Neb. 364, 855 N.W.2d 1 (2014).

## V. ANALYSIS

### 1. RECEIPT OF CHEMICAL BREATH TEST

Furman first assigns the district court erred by affirming the county court's admittance of his chemical breath test at trial. Furman argues that his chemical breath test should have been excluded because the State did not introduce a certified current copy of Title 177. Because he asserts a certified copy of Title 177 is a foundational requirement for the admission of a breath test, he contends the county court should not have received the results of his breath test into evidence.

The State makes several arguments in opposition to Furman's assignment. First, the State agrees with the ruling of the district court that Furman's foundation and hearsay objections were inadequately specific because they were made in relation to the offering of five exhibits and did not specifically raise the issue of certification before the county court. Second, the State argues that even if Furman's objections were properly preserved, the copy of Title 177 was properly received into evidence because it bore official government stamps and signatures and was claimed to be a fair and accurate copy of the rules provided in Title 177. Lastly, the State asserts that a copy of Title 177 is not a necessary foundational requirement for the admittance of a breath test in DUI cases because, as a public regulation, it is subject to judicial notice.

We agree with the State and district court that Furman failed to preserve his objections on appeal. Objections assist the court to make correct and fair decisions on evidentiary matters by alerting the court to the proper course of action on evidentiary matters and directing the court's attention to questioned admissibility of particular evidence so that the court may intelligently, quickly, and correctly rule on the reception or exclusion of evidence. *State v. Huston*, 285 Neb. 11, 824 N.W.2d 724 (2013). Unless an objection to offered evidence is sufficiently specific to enlighten the trial court and enable it to pass upon the sufficiency of such objections and to observe the alleged harmful bearing of the evidence from the standpoint of the objector, no question can be presented therefrom on appeal. *State v. Henry*, 292 Neb. 834, 875 N.W.2d 374 (2016). In seeking to exclude evidence, counsel must adhere to a basic and straightforward approach: Tell the court the reason why the evidence is inadmissible! *State v. Coleman*, 239 Neb. 800, 478 N.W.2d 349 (1992). As expressed by the Nebraska Supreme Court, "A true objection does not wander among the Nebraska Evidence Rules in the hope of eventually ending its odyssey at the doorstep of a particular rule of evidence." *State v. Coleman*, 239 Neb. at 812, 478 N.W.2d at 357.

When the State offered the copy of Title 177 into evidence, it also offered four other exhibits. When this group of exhibits was offered, Furman's counsel stated, "Objection: foundation, hearsay." We do not believe that broadly objecting to five exhibits on foundational and hearsay grounds is sufficiently specific to preserve Furman's claim that the copy of Title 177 lacked proper certification.

A foundation objection is a general objection, which requires the court to engage in interpretation on appeal, rather than be apprised of the real basis for the objection. *State v. Smith*, 292 Neb. 434, 873 N.W.2d 169 (2016). Thus, a party may not normally complain on appeal for an overruled foundation objection unless the grounds for the exclusion are obvious without stating it. *Id.* For hearsay objections, it is generally sufficient to make a general hearsay objection to a specific statement, but a general hearsay objection to the entirety of a witness' testimony or to

multiple statements in an exhibit, each admissible or objectionable under differing theories, is not usually sufficient to preserve the hearsay objection. See *State v. Henry, supra*. Rather, the opponent to the evidence must identify which statements are objectionable as inadmissible hearsay. *Id.*

Because Furman's objections occurred in relation to the offering of five exhibits and did not specifically raise the issue of certification, we do not believe it was obvious that Furman was objecting to the copy of Title 177 because it was uncertified. As noted by the district court, Furman "did not even alert the county court to the certification issue he raises on appeal." Therefore, we determine Furman's objections were not sufficiently specific nor obvious enough to preserve his claim on appeal. With this finding, we do not address the parties' other arguments. See *Jamie N. v. Kenneth M.*, 23 Neb. App. 1, 867 N.W.2d 290 (2015) (an appellate court is not obligated to engage in analysis which is not needed to adjudicate controversy before it).

### 2. MOTION TO SUPPRESS

Furman next assigns the district court erred in affirming the county court's denial of his motion to suppress. He makes three arguments in connection to this assignment: (1) Backer was operating outside of his primary jurisdiction when he unlawfully seized him; (2) Sturdy lacked reasonable suspicion to detain him in his patrol car; and (3) Schnieder and Hoggins lacked reasonable suspicion to have him conduct field sobriety tests.

To determine whether an encounter between an officer and a citizen reaches the level of a seizure under the Fourth Amendment to the U.S. Constitution, an appellate court employs the analysis set forth in *State v. Van Ackeren*, 242 Neb. 479, 495 N.W.2d 630 (1993), which describes the three levels, or tiers, of police-citizen encounters. *State v. Shiffermiller*, 302 Neb. 245, 922 N.W.2d 763 (2019). The first tier of police-citizen encounters involves no restraint of the liberty of the citizen involved, but, rather, the voluntary cooperation of the citizen is elicited through noncoercive questioning. *Id.* This type of contact does not rise to the level of a seizure and therefore is outside the realm of Fourth Amendment protection. *State v. Shiffermiller, supra.* The second category, the investigatory stop, as defined by the U.S. Supreme Court in *Terry v. Ohio*, 392 U.S. 1, 88 S. Ct. 1868, 20 L. Ed. 2d 889 (1968), is limited to brief, nonintrusive detention during a frisk for weapons or preliminary questioning. *State v. Shiffermiller, supra.* This type of encounter is considered a "seizure" sufficient to invoke Fourth Amendment safeguards, but because of its less intrusive character requires only that the stopping officer have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. *State v. Shiffermiller, supra.* The third type of police-citizen encounters, arrests, is characterized by highly intrusive or lengthy search or detention. *Id.* The Fourth Amendment requires that an arrest be justified by probable cause to believe that a person has committed or is committing a crime. *State v. Shiffermiller, supra.* As noted, only the second and third tiers of police-citizen encounters are seizures sufficient to invoke the protections of the Fourth Amendment to the U.S. Constitution. *State v. Shiffermiller, supra.*

### (a) Initial Contact

Furman first asserts his Fourth Amendment rights against unreasonable search and seizure were violated when Backer unlawfully seized him outside of his primary jurisdiction. Because the Supreme Court has recently held that a law enforcement officer acting outside their primary

jurisdiction, by itself, does not implicate Fourth Amendment protections, this assignment of error fails.

Furman's argument asserts that Backer violated his Fourth Amendment rights because he acted outside of his primary jurisdiction in violation of Neb. Rev. Stat. § 29-215 (Reissue 2016). Section 29-215 generally provides that an officer has "the power and authority to enforce the laws of this state . . . anywhere within his or her primary jurisdiction" and identifies circumstances when an officer who is "beyond his or her primary jurisdiction" has "the power and authority to enforce the laws of this state."

After the parties had already submitted their briefs, the Supreme Court decided *State v. Hoehn*, 316 Neb. 634, 6 N.W.3d 487 (2024). In that case, an officer working for the Minatare Police Department left his primary jurisdiction to investigate a possible drunk driver. After finding a vehicle matching the description straddling the centerline, the officer conducted a traffic stop. Because the officer observed that the driver had slurred speech, bloodshot and watery eyes, and smelled like alcohol, he conducted a preliminary breath test and arrested the driver. At a suppression hearing, the defendant argued that he was unlawfully seized without probable cause in violation of his rights under the "Fourth and Fourteenth Amendment of the U.S. Constitution and also Art. I § 7 of the Nebraska Constitution, and all applicable statutes." *State v. Hoehn*, 316 Neb. at 638, 6 N.W.3d at 490. The county court denied the motion to suppress finding that the officer had probable cause to administer the arrest. *Id.* Following a bench trial, where Hoehn renewed his objections based on the Fourth and Fourteenth Amendments, Hoehn was found guilty and convicted of DUI with a blood alcohol content of .08 or more, a Class W misdemeanor.

Hoehn then timely appealed the denial of his motion to suppress with the district court, which affirmed the county court's decision. He then appealed to this court, which affirmed the district court, albeit on different grounds. In this decision we determined that the officer acted outside his primary jurisdiction pursuant to § 29-215 and that this violated his Fourth Amendment rights. *State v. Hoehn, supra.* However, we concluded that because the officer could have reasonably believed that he had jurisdictional authority to stop and arrest Hoehn, the good faith exception to the exclusionary rule applied. *Id.* Thus, we declined to apply the exclusionary rule and affirmed Hoehn's conviction and sentence. *Id.*

Hoehn then appealed to the Supreme Court, which affirmed our holding, but on different grounds. By the time the appeal reached the Supreme Court, Hoehn's sole argument was that "the Court of Appeals erred in determining it was reasonable for an officer . . . to mistakenly believe he had the statutory power and authority to make the stop and that therefore, it serves no deterrent purpose to apply the exclusionary rule." *Id.* at 648, 6 N.W.3d at 496. The court disagreed with our reasoning and decided that violations of § 29-215 do not implicate the Fourth Amendment protections nor the exclusionary rule. *State v. Hoehn, supra.* The court held that in the absence of an argument asserting the officer lacked reasonable suspicion to conduct the stop or probable cause to administer the arrest, it does not matter for Fourth Amendment purposes whether the officer exceeded his authority under § 29-215. *State v. Hoehn, supra.* Specifically, the court stated, "A law enforcement officer's jurisdictional power and authority to make a stop or arrest is irrelevant to the admissibility, under the Fourth Amendment and article I, § 7, of the Nebraska Constitution, of the evidence obtained from the stop or arrest." *State v. Hoehn*, 316 Neb. 634, 656, 6 N.W.3d 487, 501 (2024).

We tend to agree with the State and the lower courts that Backer did not detain Furman. However, even if we were to find that Backer unlawfully seized Furman in violation of § 29-215, this seizure would not constitute a Fourth Amendment violation. Thus, the exclusionary rule would not apply. Accordingly, because Furman does not assign that Backer lacked reasonable suspicion to detain him and *Hoehn* clearly found that a violation of § 29-215, alone, is irrelevant to the admissibility of evidence under the Fourth Amendment, we determine that this assignment of error fails.

### (b) Subsequent Seizure

Furman next asserts that Sturdy did not have reasonable suspicion to detain him by placing him in the backseat of his secured patrol car.

In order to seize or detain a person, an officer must have specific and articulable facts sufficient to give rise to reasonable suspicion that a person has committed or is committing a crime. See *State v. Samuels*, 31 Neb. App. 918, 991 N.W.2d 900 (2023). Reasonable suspicion entails some minimal level of objective justification for detention, something more than an inchoate and unparticularized hunch, but less than the level of suspicion required for probable cause. *Id.* Whether a police officer has a reasonable suspicion based on sufficient articulable facts depends on the totality of the circumstances. *Id.* Reasonable suspicion must be determined on a case-by-case basis. *Id.* In determining whether a police officer acted reasonably, it is not the officer's unparticularized suspicion that will be given due weight, but the specific reasonable inferences which the officer is entitled to draw from the facts in light of the officer's experience. *State v. Saitta*, 306 Neb. 499, 945 N.W.2d 888 (2020).

We determine that Sturdy had reasonable suspicion to detain Furman on the suspicion of driving under the influence. When Sturdy arrived at approximately 5:30 in the morning, the vehicle was parked perpendicularly 10 to 12 feet away from the road in a ditch. After asking Furman what happened, he said that he had been headed home at around 11 p.m. or 12 a.m. the previous night and pulled over to get some rest. At this point, he noted that Furman smelled like alcohol. We believe that the totality of these circumstances gave rise to reasonable suspicion that Furman had been driving under the influence. While Furman argues that the smell of alcohol alone does not amount to reasonable suspicion, that is not what occurred here. Furman's car was found in a ditch in the early hours of the morning, there were tire marks indicating that the car took an unusual path from one shoulder of the road to the other, Furman admitted to having slept in the car the prior night because he was too tired to drive home, and he smelled like alcohol. Based on these facts and the reasonable inferences Sturdy was entitled to draw from them, we conclude that he had reasonable suspicion to detain Furman under suspicion of driving under the influence.

### (c) Field Sobriety Tests

Furman next asserts that Schnieder and Hoggins lacked reasonable suspicion to administer field sobriety tests on him. An officer is required to have only a reasonable, articulable suspicion that a motorist was driving under the influence in order to expand the scope of the initial stop and detain him or her for field sobriety tests. *State v. Lamb*, 280 Neb. 738, 789 N.W.2d 918 (2010), disapproved on other grounds by *State v. Melton*, 308 Neb. 159, 953 N.W.2d 246 (2021).

- 10 -

For similar reasons that Sturdy had reasonable suspicion to detain Furman, Schnieder and Hoggins had reasonable suspicion to administer field sobriety tests. Once Schnieder began speaking with Furman, Furman told him that he had been at a work event the previous night and had consumed two beers and two sake bombs. Furman also told him that his car was in the grass because he pulled over on the way home to rest. Schnieder also testified that Furman's eyes were red and bloodshot, that he smelled like alcohol, and that he was having difficulty maintaining his dexterity. Based on the totality of the circumstances of Furman's vehicle being found in a ditch in the early hours of the morning, him telling law enforcement that he had slept there the prior night because he was too tired to drive home, him smelling like alcohol and having bloodshot eyes, and him stating that he had consumed four alcoholic beverages the previous night, we determine that Schnieder had reasonable suspicion to conduct field sobriety tests.

We therefore conclude that the district court did not err in affirming the county court's denial of Furman's motion to suppress.

### 3. Testimony on Horizontal Gaze Nystagmus

Furman next assigns the district court erred in affirming the county court's overruling of his objection to Schnieder's testimony that the presence of horizontal gaze nystagmus (HGN) equates to impairment. While Schnieder explained that horizontal gaze nystagmus is the inadvertent bouncing of someone's eyes under the influence of a depressant, like alcohol, the following colloquy occurred:

> Q. Based on your training, if someone is not under the influence of alcohol, what should their eyes do?
>
> [Furman's attorney]: Your Honor, I'm going to object. That's an improper opinion. State versus Baue.
>
> . . . .
>
> THE COURT: He can answer the question.
>
> . . . .
>
> THE WITNESS: Their eyes will be very smooth. They'll track equally and they'll be very smooth. They won't tick or bounce.

Furman contends that this testimony was improper under *State v. Baue*, 258 Neb. 968, 607 N.W.2d 191 (2000). In that case, the Supreme Court overruled a prior precedent that barred the admission of horizontal gaze nystagmus test results at trial. In finding that the test is now generally accepted in the relevant scientific community, the court stated that "when the test is given in conjunction with other field sobriety tests, the results are admissible for the limited purpose of establishing that a person has an impairment which may be caused by alcohol." *Id.* at 985, 607 N.W.2d at 204. The court stated in its conclusion that it agreed with an Alaskan appellate court, which held:

> While HGN testing may not, of itself, be sufficient to establish intoxication, HGN test results are admissible as a factor to be considered by the fact-finder when determining intoxication. Testimony concerning a defendant's performance on a properly administered HGN test is admissible on the issue of impairment, provided that the prosecution claims no greater reliability or weight for the HGN evidence than it does for evidence of the

defendant's performance on any of the other standard field sobriety tests, and provided further that the prosecution makes no attempt to correlate the HGN test result with any particular blood-alcohol level, range of blood-alcohol levels, or level of impairment.

*Id.* at 985, 607 N.W.2d at 204 (citing *Ballard v. State*, 955 P.2d 931 (Alaska App. 1998). Thus, the court concluded "that while [a horizontal gaze nystagmus] test result is relevant to show that an individual is impaired, such a result, standing alone, is insufficient to prove the offense of DUI." *State v. Baue*, 258 Neb. at 985, 607 N.W.2d at 204.

Furman contends that the *Baue* ruling held that "any opinion that states the presence of [horizontal gaze nystagmus] establishes impairment is improper." Brief for appellant at 28. Therefore, he asserts that because Schnieder's testimony conflated nystagmus with impairment, his objection should have been sustained and the only available remedy is to grant him a new trial.

First, we determine that Furman's objection to the State's question was properly overruled. The objection made by Furman was to the prosecutor's question, not Schnieder's answer. The question posed to Schnieder asked him, based on his training in conducting DUI investigations, what a person's eye *should* do on the horizontal gaze nystagmus test if they were not under the influence of alcohol. While his response arguably was more expansive than the question asked, Furman did not object to the answer or seek to have it stricken. Therefore, it is questionable whether the issue raised by Furman on appeal has been properly preserved.

But, even if Furman's objection can be construed to be broad enough to encompass Schnieder's answer, we nonetheless find that his testimony did not violate the principles enunciated in *Baue.* When the testimony regarding the administration of the horizontal gaze nystagmus test to Furman is considered in the context of all the testimony about indicators of impairment, there is no indication that the HGN results were portrayed as more reliable or should be given greater weight than any of the other field sobriety tests. Likewise, we do not believe this testimony attempted to correlate the test result with a particular blood alcohol level, range of blood-alcohol level, or level of impairment.

The totality of the evidence includes Furman being found asleep at 5:30 in the morning while sitting in the driver's seat of a running vehicle that was parked in a ditch on the side of the road, tire tracks that indicated the car had traveled across the road and up an embankment, Furman's statements that he had been drinking the previous night and had been too tired to drive all the way home, the results of his other field sobriety tests, Backer's observations that he was disheveled and smelled like alcohol when he first approached him, the deputies' observations that he was slurring his speech, disheveled, had bloodshot eyes, and smelled of alcohol, and the results of his chemical breath test showing an alcohol level above the legal limits. With all this evidence introduced at trial, it is clear that Schnieder's testimony concerning the horizontal gaze nystagmus test was not proffered as the sole basis for the jury to believe that Furman was intoxicated. Rather, it was simply one of many pieces of evidence adduced regarding impairment. We fail to see how this testimony in any way violated the principles enunciated in *State v. Baue, supra.* Accordingly, we conclude that this assignment of error fails.

## VI. CONCLUSION

We determine the district court did not err in affirming the county court's admittance of exhibit 14 because Furman's foundation and hearsay objections were not sufficiently specific or obvious to preserve his claim that the exhibit was uncertified. Likewise, we affirm the denial of Furman's motion to suppress because an officer exceeding their primary jurisdiction does not implicate the Fourth Amendment and Schnieder and Hoggins had reasonable suspicion to detain Furman and conduct field sobriety tests. Lastly, we conclude that it was not an error to overrule Furman's objection to Schnieder's testimony because the testimony did not run afoul of the Supreme Court's holding in *State v. Baue, supra*. Accordingly, we affirm the district court's order.

AFFIRMED.